2011 Ark. App. 224

**Jeffery STROTHER, Jerry Strother, and Elois Strother, Appellants**

v.

**David W. MITCHELL and Laura Mitchell, Appellees.**

**No. CA 10–920.**

Court of Appeals of Arkansas.

March 16, 2011.

---

Mark Mason Derrick, Searcy, for appellants.

Martin Blair Arnold, Batesville, for appellees.

WAYMOND M. BROWN, Judge.

This case involves a 1.76–acre tract of land located in Independence County, Arkansas. Appellant Jeffery Strother appeals the trial court's decision finding that the contested land belonged to appellee David Mitchell. Strother argues on appeal that the trial court erred in finding that he had not proven his claims of boundary by acquiescence or adverse possession. He further contends that the trial court erred in granting Mitchell damages and in granting Mitchell's motion for Rule 11 sanctions. We find no error and affirm.

David Mitchell and his wife, Laura, received a quitclaim deed for their property on April 9, 2007. David had a survey performed on October 6, 2008, and following that survey, he began to erect a new fence along the property line. Jeffery Strother saw the new construction and tore it down. He also removed survey ribbons on two separate occasions.

Strother filed a petition to quiet title to the disputed property on March 2, 2009. In the petition, he alleged ownership in the property under the theories of boundary by acquiescence and adverse possession. Mitchell filed a motion to dismiss on March 19, 2009, alleging that Strother failed to include indispensable parties in his complaint. Strother filed a response on March 26, 2009. On April 6, 2009, Strother filed an amended petition including the necessary parties.[1] In the petition, Strother alleged that Mitchell was attempting to move the boundary fence "some Thirty feet from the agreed fence and established boundary." Mitchell filed an answer on April 21, 2009. He filed an amended answer and counterclaim on September 10, 2009.[2] In his counterclaim, Mitchell sought damages in the amount of $2,925 (the amount it cost him to build a fence on his property line, part of which was destroyed by Strother). Mitchell also sought treble damages for a total amount of $8,775 as well as other costs and relief to which he might be entitled. An answer was filed on September 18, 2009, denying Mitchell's affirmative defense.

The hearing took place on April 1, 2010. Jerry Strother testified that he and his wife had lived on the property south of Mitchell's property for over forty-five years. He said that the property had been in his family for a number of years before that. According to Jerry, he and his father ran cattle on their property. Jerry stated that he was familiar with the Creech property.[3] He testified that Mr.

---

1.  His mother and father.

2.  In his answer, Mitchell argued that the Strothers should be collaterally estopped from alleging ownership to the disputed property a second time. Elois and Jerry Strother nonsuited a case against Grace and Leland Shel-

don involving the same "line" on February 28, 1983. The non-suit was filed of record on March 9, 1983.

3.  The Creeches were the original owners of Mitchell's property. They sold the property to Foster, who sold it to Mitchell.

Creech owned 160 acres of property that was "just all woods." According to Jerry, Mr. Creech started clearing his land and eventually cleared most of it. Jerry stated that when he received title to his property in June 1960, there was no established fence between his property and the Creeches' property. He said that Mr. Creech constructed the fence sometime after 1960, and the fence "ran all the way across the property from the West side to the East side." Jerry stated that he helped to maintain the fence once it was constructed. He further testified that the Creeches had quite a few cattle and a lot of goats. Jerry said that he posted signs on the fence for over thirty years to keep others from coming onto the property to hunt. He stated that the Creeches never came onto his side of the fence except for one time when one of Mr. Creech's bulls got loose. In regard to the maintenance of the fence, he stated

> Both of us maintained the fence if something happened to it. There wasn't a whole lot [that] happened to it. It was a good fence and you hardly ever had anything unless a tree or something would fall on it or a limb or something like that. But I worked on the fence and he did to [o]. Which ever one of us noticed it was down, why, they fixed it.

Jerry testified that he deeded the property to his children. The property was later deeded to appellant and his ex-wife.[4]

On cross-examination, Jerry stated that the disputed property had never been cleared. He testified that he ran cattle on the disputed property; that before he was diagnosed with Lupus, he went to the disputed strip anytime he wanted to; that he cut wood up there; that he posted signs on the fence for over thirty years; that

when purple paint came out, he painted the posts or a nearby tree; and that he helped with work on the fence as recently as ten to fifteen years ago. He also stated that he did not help pay for or build the fence and that he had never bush-hogged, fertilized, or mowed the contested strip.

Danny Robertson testified that he was a professional land-surveyor. He stated that he surveyed a piece of property for Strother. According to Robertson, the fence was extremely old, dating back at least thirty years. On cross-examination, he stated that he thought he saw some old stumps on the disputed strip, but he could not remember. However, he testified that he did not see any cow "patties" or any other signs of use on the property except for evidence that someone had been in there taking down a fence.

Elois Strother testified that she had been married to Jerry for over fifty-five years. She stated that she and her husband filed a lawsuit against the Sheldons in the '80s, but they never went to court. According to Elois, they did not get a court date or anything, they could not even talk to a lawyer. She said that the Sheldons stopped building the road and did not "come back on the place." She stated that the Creeches never said anything to them about the lawsuit.

Strother testified that he had been living on the property close to the disputed strip since 1997; however, he said that he had lived somewhere on the property his whole life. According to Strother, as a child, he rode his three-wheeler and motorcycles on the strip. He stated that he cut wood, fixed the fence, ran cattle, and even rented out the disputed strip of land. He testified that the renters also ran cattle to the

---

4. Appellant's ex-wife assigned him her interest in the property via a quitclaim deed dated January 9, 2002.

fence. Strother said that he has been cutting trees from the 1.76–acre strip for over twenty years. He acknowledged that the land is rocky and is not good for a "whole lot." Strother testified, "I [have] never had discussions with the Creech[e]s about them being on my side of the fence or me being on their side of the fence. It was understood as the boundary. We marked it as the boundary. And we treated it as the boundary." He stated that he took a picture of the fence in January 2009, which reflected purple paint placed on the fence by Mitchell. Strother said that there are at least twenty years of purple paint on the fence. He stated that he had never seen the Creeches, the Fosters, or the Mitchells on his side of the fence until recently. According to Strother, he recently saw Mitchell on the south side of the fence. Strother said that the fence had been up so long that trees had grown into it. He stated that he had made repairs to the fence and that he would "try to go out every month or so." Strother testified that he had not run cattle "up there in the last few years or so." He stated that he and his sons hunt, play paint ball, and ride four-wheelers on the property, when the ticks are not so bad. He testified that he has never fertilized or bush-hogged the strip. According to him, he moved "up in the middle of the woods to be left alone." Strother stated that he liked the area "grown up." Strother testified that the Creeches had goats and cattle on their property and that he did not recall those goats and cattle coming across the fence. He stated that other than the Sheldons, they never had an issue about the fence. He said that in his opinion, the fence had always been the boundary between the two properties.

On cross-examination, Strother acknowledged that he tore down Mitchell's fence; however, he denied tearing the survey markers out. He stated that he last cut wood in the disputed area about ten to fifteen years ago. He further testified, "I can't tell you conclusively that I have cut timber [in] that particular strip. I've cut timber out of the area." Strother stated that he had treated the fence as his property by maintaining it and painting it purple. He said that he has been to the disputed strip hundreds of times and that he had never seen anyone up against the fence. Strother said that during his visits to the fence, he saw people in the pasture and that they would have been able to see him if they had looked.

Jody Loggins testified that he was a long-time friend of Strother. He stated that he had cut wood near the fence and had also helped Strother mend the fence. According to Loggins, he helped Strother cut up wood on the strip two or three years ago. Loggins testified that he thought that the south side of the fence was Strother's property. On cross-examination, Loggins stated that he had seen cattle signs and cow patties "up there close to the fence." He acknowledged that he did not know whose cattle was on the property. Loggins said that he helped Strother mend the fence on approximately three separate occasions. He also stated that he helped Strother cut a limb that had fallen on the fence two or three years ago.

Mitchell testified that he did not recall any purple paint on the south fence when he purchased the property. He also stated that he did not see any signs, trespassing, or stumps. According to Mitchell, he never saw anyone or anything on the other side of the fence. He said that the only time he saw someone was when he saw Strother while walking down the survey line. Mitchell stated that Strother was leaning against a tree located south of the survey line. Mitchell also testified that it was his understanding that the "property line was in the woods, along the south line

there." He stated that since he did not know exactly where the property line was located, he hired Kenny Fletcher to survey and mark the line. He continued:

I had the surveyor flag the line all the way down. The flags were pulled off. I have been down there and personally seen that they were gone. The flags were only taken down where the land adjoins the Strothers. It wasn't taken anywhere else. I had the surveyor go back and re-flag it. Those flags are not still up.

Half of the fencing Johnson Fencing did was with the Strothers. I paid them for fencing it, for the barbed wire and everything. They gave me a receipt. I had to pay them $2,925.00. Right now I have to put half of the fence back up. I had to pay the surveyor to go back out and re-flag it after the flags got torn down the first time. I paid $700.00. At this point I am going to have to get the surveyor out and have him re-flag it again.

Mitchell stated that he had not seen any evidence that Strother was claiming ownership north of the actual line. He said that except the one time he saw Strother south of the line, he had never seen anyone on the other side of the fence.

On cross-examination, Mitchell stated that he had worked on the fence since he purchased the property. He said that he built a new fence along his west and south property lines. Mitchell testified that parts of his new fence are still standing and that it is only where he assumes the Strothers' land begins that his fence has been cut and everything taken down.

On redirect, Mitchell stated that only one-fourth of his bill from Johnson Fencing would be for the part of the fence that Strother tore down.

Oleta Creech testified that she and her husband owned the land containing the disputed strip of property. She stated that they lived close to the south line and that her husband had the land surveyed and placed the fence near the line. She said that her husband cleared what they fenced.

During voir dire, Mrs. Creech stated that the fence did not go all the way to their south property line. She said that they cleared the area they fenced because they had row crops, cows, and pastures. She stated that she had never seen cattle on the other side of the fence; that she had never seen any signs that said "posted", "no trespassing", or "no hunting"; and that she never saw any purple paint placed along the fence or the edge of the pasture. She further said that she and her husband took care of the fence and repaired it when it was needed. According to Mrs. Creech, she never saw the Strothers working on the fence.

On cross-examination, Mrs. Creech stated that they never allowed hunters to come onto their property and hunt; however, she said that if hunters were south of the fence, they would have left them alone. Mrs. Creech testified that she and her husband mainly stayed on the north side of the fence. She stated that if something took place on the south side of the fence, she did not expect the Strothers to do anything about it. She testified that the Strothers never did "anything up there." Mrs. Creech stated that they would only go south of the fence to maintain it.

On redirect, Mrs. Creech stated that they owned enough land immediately south of the fence to give a road around the property so that others could access their property. According to Mrs. Creech, that was the reason the fence was dropped back.

Jimmy Creech, Mrs. Creech's son, testified that he did not remember seeing any

cattle just across the fence; that he did not remember seeing any no trespassing or no-hunting signs; that he did not remember seeing any purple paint along the fence; that he did not remember seeing any of the Strothers along the edge of the fence; and that he did not see any kind of activity that would indicate that the Strothers were doing something on the land south of the fence. He stated that he left home in 1966, and even though he never moved back home, he would come back and visit at least once a year.

Mike Foster testified that he purchased the property from Mrs. Creech in 1992. He owned the property until he sold it to the Mitchells in 2007. He stated that it was his understanding that the "fence running along the south pasture was not the line of [his] property. [His] understanding was that the actual boundary line was south of that a little ways or a ways." He said that he was not sure how far the line was located from the fence but that he knew that the fence was not the true boundary. Foster stated that he raised cattle on the property and that he did not remember seeing any cattle on the other side of the fence. He also denied seeing any signs, any purple paint, or the Strothers at or near the fence.

On cross-examination, Foster stated that he never knew where the south property line was, and he never tried to determine its location. He testified that he maintained the fence and used it to keep his cattle in. He said that he only used the property up to the fence.

On redirect, Foster stated that he never saw the Strothers working on the fence. On re-cross, he acknowledged that it was possible that the Strothers performed work on the fence without him knowing.

Floyd Mitchell testified that he placed the purple paint on the fence because he did not know where the line was and the fence was the easiest place to paint. He said that he did not see any old paint on the posts when he painted the fence. On cross-examination, he stated that the paint was to keep others from coming over to the other side of the fence. Floyd said that at the time the fence was painted, his son had not had his property surveyed.

After being recalled, Strother testified that he had not seen any sign that Mitchell had come over to his side of the disputed strip to clean up. On cross-examination, he stated that he took Mitchell's fence down. He also said that he had cleared "stuff off the fence since the ice storm." According to Strother, he planned to clear a considerable amount out of the woods once this case was resolved.

The court issued an opinion on June 16, 2010, dismissing Strother's motion to quiet title with prejudice. The court entered a judgment in the amount of $1,535.71 against Strother to cover Mitchell's cost to re-flag the line and to have the torn-down fence replaced. Strother filed a notice of appeal on June 23, 2010. He also filed a motion for relief from judgment and/or decree the same day. In the motion Strother alleged that Judge Weaver had dated his ex-wife for a substantial time, which constituted a conflict in "the determination of the credibility of the witnesses and therefore resulted in a miscarriage of justice." Strother also alleged that his ex-wife told the Mitchells that they "were in 'good shape' or something to that effect." It was argued that at the time the statement was made, his ex-wife worked at Blair Arnold's law firm.[5] Strother prayed that the judgment be vacated and the case transferred to another court.

---

5. Mr. Arnold was Mitchell's attorney.

Mitchell filed a response on June 30, 2010, stating that Strother and his attorney knew that Strother's ex-wife and Judge Weaver had dated prior to the hearing.[6] Mitchell also stated that Judge Weaver and Strother's ex-wife's relationship predated her employment with Arnold's firm by a number of years. Mitchell also sought reimbursement of attorney's fees incurred for responding to Strother's motion under Rule 11. Included in Mitchell's answer were affidavits from Strother's ex-wife and Mitchell and his wife. Mitchell also filed a motion for sanctions on June 30, 2010.

A hearing was held on July 16, 2010. Strother's son testified that he was between eight and ten when his parents divorced. He said that he was aware that his mother dated Judge Weaver following the divorce, but he never discussed it with his father until "the day after they got back from court." On cross-examination, he stated that he believed that his mom dated Judge Weaver about seven years ago. He said that he did not know who his mom was working for at the time she and Judge Weaver dated. He also testified that his mom began working for a law firm in Jonesboro around August 2009.

Strother testified that he did not recall ever meeting Judge Weaver.[7] Strother stated that he felt that it was human nature not to like your girlfriend's or boyfriend's former spouse. He reasoned that since Judge Weaver dated his ex-wife, it would be the judge's "natural response" not to like him. The court asked Strother to explain the facts that supported his motion for relief. Strother testified that his son had recently applied for a job and that his ex-wife listed Judge Weaver as a possible job reference. Strother stated that he and his ex-wife did not get along well after the divorce and that he heard that she had told the Mitchells that they were in good shape. Strother said that he believed that his ex-wife was working for Arnold's firm when she and Judge Weaver dated. He testified that he felt that "the judge's relationship with [his] ex-wife could have had an effect on [the judge's] decision."

On cross-examination, Strother stated that he did not know where his ex-wife was working when she dated Judge Weaver; however, he stated that he thought she was working for Arnold's law firm. He acknowledged that he did not ask anyone where his ex-wife was working when she dated Judge Weaver. Strother stated that he did not realize that his ex-wife left Arnold's law firm eight months before the case came to trial. He testified that he alleged that his ex-wife was working for Arnold's law firm because that was where his son stated he thought she was working. Strother stated that he believed that Judge Weaver had thrown his case because he once dated Strother's ex-wife. He continued:

> I don't have absolute facts. What I have is the way that I feel and I can't know the inside of someone's mind. The facts that I had were that they had, in fact, dated. And I know what a huge fan she is of mine. So, I would expect that he would be aware of that as well. I would expect that she would have gone and talked to Judge Weaver because they had once dated and therefore he would throw the case.

---

6. Strother's attorney called J.T. Skinner over a year before the case was heard and mentioned that Strother's ex-wife and the judge had dated. Additionally, it was alleged that Strother had met the judge while he was dating Strother's ex-wife.

7. Judge Weaver also denied seeing Strother before the land dispute.

On redirect, Strother stated that his ex-wife was working for Arnold's law firm when his action was filed. He testified that he would have asked to have his case transferred if he had known that his ex-wife and Judge Weaver had once dated. Strother also stated that over the years, people had told him that he was the subject of conversation over at Arnold's law firm. He said that this gave him the impression that "her and anybody that she's a[n] acquaintance with has a pretty low opinion of [him]." Strother testified that his ex-wife's name was brought up at the beginning of his case and that everyone who knew her, knew who he was.

On re-cross, Strother testified that he and his ex-wife once shared ownership interest in the land south of the Mitchells. He stated that as part of their divorce settlement, she gave him a deed for her interest. He said that her name was brought up in court when Mitchell sought to have the case dismissed because she was not present.[8]

Upon examination by the court, Strother stated that Mitchell told him after the lawsuit was filed that Strother's ex-wife had told him that they were in good shape. Strother said that he did not subpoena Mitchell because he assumed Mitchell would be there. Strother testified that when he learned that his ex-wife had dated Judge Weaver, the statement to Mitchell made sense to him. Strother also stated that he based his motion on information he gathered from his seventeen-year-old son concerning events that took place when he was about twelve.

Judge Weaver stated on the record that he did not know who Strother was. He acknowledged that he dated Strother's ex-wife for a little over a month in 2005. He stated that he had not had a relationship with her since that time. He said that he thought Strother's ex-wife was a fine person and that he did a letter of recommendation for her in the past because he knew that she was a good paralegal. Judge Weaver stated that he believed Strother's son was a fine young man and that he would give him a reference just as he has done for others. He further stated that he never had a conversation about Strother and that he did not even know Strother's name.

The court gave Strother an hour to present evidence that his ex-wife was working for Mr. Arnold's law firm at the time she and Judge Weaver dated. The court also told Strother to call and get Mitchell to the hearing.

When the hearing resumed, Strother introduced two check stubs for his ex-wife. The first check stub was issued April 28, 2006, nearly a year after the time Judge Weaver acknowledged he had dated her. The court asked Strother's attorney if he had any proof that Judge Weaver threw the case because he knew Strother's ex-wife over five years ago. The attorney replied no.

Mitchell denied telling Strother anything concerning a statement made by his ex-wife. Mitchell said that he had never met Strother's ex-wife, nor had he ever talked to her. On cross-examination, he stated that he and Strother really did not have a conversation about the lawsuit when he saw Strother leaning against a tree south of Mitchell's property line. Mitchell told the court that it was not possible that he said anything to lead Strother to believe that the case was fixed.

Strother's son was recalled, and he stated that he once went to Judge Weaver's

---

8. Strother's attorney informed the court that he did not remember a verbal motion at the trial and that the motion to dismiss was filed by Mitchell on March 19, 2009.

house with his mother.[9] Upon examination by the court, he said that he told his father that his mother dated Judge Weaver for a while, but not for a substantial time. He acknowledged that five years ago, he would have been twelve. He said that he did not remember if his mother was working for Arnold's law firm five years ago. He also stated that his mother wrote Judge Weaver's information down as a possible job reference but that he never used it.

Mark Derrick, Strother's attorney, testified that he filed the motion for relief of judgment based on the information he received from Strother. He said that he believed Strother because he had never known Strother to lie to him. Derrick stated that he did not verify whether the statement that Strother's ex-wife worked for Arnold's law firm during the time she dated Judge Weaver was factually correct because he "really did not feel like it was all that relevant to the issue." Derrick acknowledged that someone had told him that Judge Weaver and Strother's ex-wife had dated sometime before April 1, 2010. He stated that at the time he drafted the motion, he did not remember that he was aware of that fact. According to Derrick, he did not remember the information until after the response came out. He testified that Strother was his sole source of information. He stated that the pleading was poorly drafted. Derrick also stated that Strother did not ask him to file the motion but he decided to do so after speaking to other attorneys. He said that the idea to file the motion came up because of the finding on the credibility of the witnesses. He confessed that he was thinking on a subconscious level. He stated that he did not believe that Strother's ex-wife would have anything good to say about Strother. He further testified:

I was not intending to say you are a crooked judge. I guess it was a poor pleading. It was the fact that you dated her. I did not feel like you would have gotten any good information and you would have gotten nothing but bad information on Mr. Strother. When it came down to the credibility of the witnesses, I felt like anything that she said could still be in your mind. I was at a CLE on appella[te] work and after the class and just in generic terms I explained to him what had happened. And he said—I said I don't like filing it because I don't think it's going to come out good. And he said, you've go[t] to, to save it for appeal. You've got to do it to represent your client.

The court denied Strother's motion for relief from judgment. It granted Mitchell's motion for sanctions because "the motion is not based on a reasonable inquiry and is not well grounded in fact." Arnold was asked to submit an affidavit of time spent working on the motion. The court postponed making a ruling until the affidavit was submitted. The court said that it would be reporting Derrick to the Lawyer's Ethics Committee. Judge Weaver also stated that he would be making a report to the Judicial Discipline and Disability Committee.

Arnold submitted his affidavit on July 20, 2010. In the affidavit, he stated that he charged $200/hour and that he had spent a total of 7.50 hours dealing with the motion for relief from judgment and/or decree and with his motion for Rule 11 sanctions.

The court filed an order on August 2, 2010, awarding Arnold attorney's fees in the amount of $1,125. Strother was ordered to pay Arnold within ten days in order to avoid a finding of contempt or

---

**9.** Judge Weaver stated that he did not remember him coming to his house.

other sanctions by the court. The court also filed an order denying Strother's motion for relief from judgment and/or decree on August 2, 2010. Strother filed an amended notice of appeal on August 6, 2010. This appeal followed.

We traditionally review quiet title and boundary line actions de novo.[10] We will not, however, reverse findings of fact unless they are clearly erroneous.[11] Further, whether possession is adverse to the true owner is a question of fact.[12] We will not reverse a trial court's finding regarding adverse possession unless it is clearly erroneous.[13] In reviewing a trial court's findings of fact, we give due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony.[14]

For his first point, Strother argues that the trial court erred by not finding that he had proven ownership to the strip of land under the theory of boundary by acquiescence. A fence, by acquiescence, may become the accepted boundary even though it is contrary to the survey line.[15] When adjoining landowners occupy their respective premises up to the line they mutually recognize and acquiesce in as the boundary for a long period of time, they and their grantees are precluded from claiming that the boundary thus recognized and acquiesced in is not the true one, although it may not be.[16] A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line.[17] It is the agreement and acquiescence, not the fence itself, that controls.[18] The intention of the parties and the significance they attach to the fence, rather than its location or condition, is what is to be considered.[19] Neither a prior dispute about the boundary line nor adverse usage up to a fence is required to establish a boundary by acquiescence.[20]

We have noted that the mere existence of a fence, without evidence of mutual recognition, cannot sustain a finding of such a boundary.[21] Also, the fact that a landowner puts a fence inside his boundary line does not mean that he is acquiescing in the fence as the boundary, thereby losing title to the strip on the other side.[22] That occurs only if the neighbor takes possession and holds it for the

10. *Price v. Rylwell, LLC*, 95 Ark.App. 228, 235 S.W.3d 908 (2006).

11. *Id.*

12. *White River Levee Dist. v. Reidhar*, 76 Ark. App. 225, 61 S.W.3d 235 (2001).

13. *Id.*

14. *Robertson v. Lees*, 87 Ark.App. 172, 189 S.W.3d 463 (2004).

15. *Summers v. Dietsch*, 41 Ark.App. 52, 849 S.W.2d 3 (1993).

16. *Clark v. Casebier*, 92 Ark.App. 472, 215 S.W.3d 684 (2005).

17. *Hedger Bros. Cement & Materials, Inc. v. Stump*, 69 Ark.App. 219, 10 S.W.3d 926 (2000).

18. *Camp v. Liberatore*, 1 Ark.App. 300, 615 S.W.2d 401 (1981).

19. *Id.*

20. *Myers v. Yingling*, 372 Ark. 523, 279 S.W.3d 83 (2008).

21. *Robertson v. Lees, supra. See also Warren v. Collier*, 262 Ark. 656, 559 S.W.2d 927 (1978); *Fish v. Bush*, 253 Ark. 27, 484 S.W.2d 525 (1972); *Carney v. Barnes*, 235 Ark. 887, 363 S.W.2d 417 (1962).

22. *Robertson, supra.*

requisite number of years.[23]

■ Because the location of a boundary is a disputed question of fact, we will affirm unless the trial court's finding is clearly against the preponderance of the evidence.[24] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite conviction that a mistake was committed.[25] Whether a boundary line by acquiescence exists is to be determined from the evidence in each individual case.[26]

■ Here, the court found Mitchell's and his predecessors' testimony that they were aware that the fence was not placed on the south property line credible. Strother and his family testified that they considered the fence to be the boundary between the properties; however, for there to be a boundary by acquiescence, there has to be mutual recognition. In the case at bar, there was no evidence of mutual recognition of the fence as the boundary. The trial court's finding on this point is not clearly erroneous. Additionally, since the Creeches placed a fence inside their own property line, the Strothers had to prove that they took possession of the strip and held it for the requisite period of time. They also failed to do this.

■ As his second point, Strother argues that the trial court erred by not finding that he had proven ownership to the disputed strip of property under the theory of adverse possession. Adverse possession is a question of fact that will not be disturbed unless clearly erroneous.[27] To prove the common-law elements of adverse possession, the claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner.[28]

■ Here, the court was not clearly erroneous in its finding that Strother failed to prove ownership of the disputed property under the theory of adverse possession. Strother contended that his family hunted the property; posted, painted, and maintained the fence; cut timber on the property; and visibly ran cattle on the property for over thirty years. However, Mitchell and his predecessors all denied ever seeing any evidence of this. It was the duty of the trial court to determine the credibility of the witnesses. The evidence, in light of our standard of review, supports the trial court's finding that Strother was not entitled to the disputed property.

As his third point, Strother argues that the trial court erred by ordering him to pay damages to Mitchell. According to Strother, he is the rightful owner of the disputed strip of property, and as such, he could remove the fence and markings placed on his property by Mitchell. Because we have already determined that the court did not err by finding that Mitchell owned the disputed property, this argument is without merit. Accordingly, the damage award is affirmed.

Finally, Strother argues that the trial court erred in granting Mitchell's motion for sanctions under Rule 11. That rule states in pertinent part:

23. *Avington v. Newborn*, 271 Ark. 648, 609 S.W.2d 678 (Ark.App.1981); *Carney, supra.*

24. *Myers, supra.*

25. *Hedger Bros. Cement & Materials, supra.*

26. *Boyette v. Vogelpohl*, 92 Ark.App. 436, 214 S.W.3d 874 (2005).

27. *See White River Levee Dist., supra.*

28. *White River Levee Dist., supra.*

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. A party who is not represented by an attorney shall sign his pleading, motion, or other paper and state his address and telephone number, if any. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law, that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation, and that it complies with the requirements of Rule of Civil Procedure 5(c)(2) regarding redaction of confidential information from case records submitted to the court. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Strother contends that even if sanctions were warranted they should have been imposed against his attorney since he was the one who signed the motion for relief from judgment and/or decree. By the terms employed in Rule 11, an attorney or party signing a pleading, motion, or other paper on behalf of a party constitutes a certificate that (1) the attorney or party made a reasonable inquiry into the facts supporting the document or pleading; (2) he or she made a reasonable inquiry into the law supporting that document to ensure that it is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and (3) he or she did not interpose the document for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.[29] When a violation of Rule 11 occurs, the rule makes sanctions mandatory.[30] Whether a violation occurred is a matter for the trial court to determine, and this determination involves matters of judgment and degree.[31] In reviewing a trial court's Rule 11 determination, we do so under an abuse-of-discretion standard.[32] In deciding the appropriate sanction, trial courts have broad discretion not only in determining whether sanctionable conduct occurred but also what an appropriate sanction should be.[33] The imposition of sanctions pursuant to Rule 11 is a serious matter to be handled with circumspection,

**29.** *Ward v. Dapper Dan Cleaners & Laundry, Inc.,* 309 Ark. 192, 828 S.W.2d 833 (1992).

**30.** *Id.*

**31.** *Id.*

**32.** *Id.*

**33.** *Williams v. Martin,* 335 Ark. 163, 980 S.W.2d 248 (1998).

and the trial court's decision is due substantial deference.[34]

 Here, Derrick filed a motion alleging that Judge Weaver threw Strother's case against Mitchell because Judge Weaver once dated Strother's ex-wife. The motion was not based on belief formed after reasonable inquiry that was well grounded in fact, as required by the statute. Instead, it was based on Strother's subconscious belief that Judge Weaver did not like him because he once dated Strother's ex-wife. When asked for proof of any of the allegations other than the fact that Judge Weaver did date Srother's ex-wife, Strother was unable to present any. Once it found a violation of the rule, the court was required to impose sanctions. |₂₃The rule gives the court the discretion to sanction the attorney, the represented party, or both. Here, the court sanctioned Strother by ordering him to pay the attorney's fees incurred as a result of Strother's filing the motion. The court also noted that it was turning in Strother's attorney to the ethics committee. Giving the court due deference, we affirm its finding of a Rule 11 violation and the $1,125 attorney's fee assessed against Strother as an appropriate sanction.

We affirm the trial court. However, we remand with instructions for the court to amend its order dismissing Strother's quiet-title claim to include a specific legal description of the boundary at issue.[35] Even though the court's June 16, 2010 order mentions the Fletcher survey, the order must describe the boundary with sufficient specificity that it can be identified solely by reference to the decree.[36]

Affirmed and remanded with instructions.

VAUGHT, C.J., and GRUBER, J., agree.

**34.** *Id.*

**35.** *See Chiodini v. Lock,* 2010 Ark. App. 340, 374 S.W.3d 835.

