

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-13-29

|  |  |
|---|---|
| CECIL JAMES REYNOLDS and DONNA REYNOLDS, His Wife; and CECIL J. REYNOLDS, SR. <br> APPELLANTS <br><br> V. <br><br> GFM, LLC <br> APPELLEE | Opinion Delivered September 11, 2013 <br><br> APPEAL FROM THE INDEPENDENCE COUNTY CIRCUIT COURT [No. CV-2010-300] <br><br> HONORABLE ADAM HARKEY, JUDGE <br><br> AFFIRMED IN PART; REVERSED IN PART |

## LARRY D. VAUGHT, Judge

In this boundary-line dispute, appellants Cecil James Reynolds, Donna Reynolds, and Cecil J. Reynolds, Sr. (collectively "the Reynoldses"), appeal the decree entered by the Independence County Circuit Court, finding in favor of appellee GFM, LLC (GFM).[1] The trial court found that (1) the Reynoldses failed to prove that a fence line on GFM's property was a boundary by acquiescence, and (2) GFM was entitled to a prescriptive easement in a road on the Reynoldses' property. On appeal, the Reynoldses challenge both findings, contending that the trial court clearly erred in denying their claim for a boundary by acquiescence and in awarding GFM a prescriptive easement in the road on their property. We affirm the former finding; however, we reverse the latter.

---

[1]Members of the Preston Grace family are the principal officers of GFM.

SLIP OPINION

GFM and the Reynoldses are adjoining landowners in the Cave Creek community located in Independence County, Arkansas. Pertinent to this appeal is property that GFM owns in Section 10, Township 14 North, Range 6 West. Due south of this property is an eighty-acre tract of land owned by the Reynoldses, which is located in Section 15, Township 14 North, Range 6 West. North of the Reynoldses' boundary line, within GFM's property, there is a fence. The area north of the Reynoldses' boundary line and south of GFM's fence—the property in dispute—is approximately eighty to one-hundred acres.

GFM initiated this case in November 2011 by filing a complaint to quiet title and for a temporary restraining order against the Reynoldses, alleging that they, without GFM's permission, cut timber and built fences and roads on its property and blocked its access to its property. In response, the Reynoldses filed an answer and counterclaim alleging that the proper boundary line between the parties was the fence line on GFM's property. The Reynoldses alleged that the fence was the boundary by acquiescence, and they sought legal title to the property in dispute.

At trial, GFM presented the testimony of Patrick Lemley, a licensed surveyor, who testified that in 2009 a member of the Grace family asked him to locate the boundary line between the parties' property. Lemley concluded that the boundary line was the southern boundary line of Section 10—not the fence on GFM's property. Lemley also testified that he found no acts of possession by the Reynoldses in the disputed property. However, he observed deer stands on the disputed property, which he believed belonged to a hunting club that GFM had on its property.

SLIP OPINION

Jimmy Lee Downs testified that he had lived in the Cave Creek community for thirty-seven years and that the fence on GFM's property dated back to the 1980s. Downs said that he had been a member of the GFM hunting club for seven to ten years, and he confirmed the existence of hunting-club deer stands on GFM's property. For years prior to the Reynoldses' ownership of the property, according to Downs, he and other hunters used the road that ran through the Reynoldses' property to access the hunting club. However, Downs added that since the Reynoldses have owned the property, the road had been closed off.

The final GFM witness was Kendall Smith. He explained that the hunting club, owned by the Grace family, managed the property in dispute.[2] He testified that on a recent visit, he traveled on the road that ran through the Reynoldses' property and was stopped and questioned by Donna Reynolds.

On behalf of the Reynoldses, Larry Wilkes, a life-long resident of the Cave Creek community, testified that the Reynoldses kept cattle on their property for forty to forty-five years and that the Reynoldses repaired the fence from time to time. He added that the fence preexisted the Reynoldses' purchase of the property, that he did not know if the fence was put up by someone who owned the land on both sides of the fence, and that he did not know if the fence line was the boundary line. Wilkes also said that he had driven on the road through the Reynoldses' property many times.

---

[2]Smith said the hunting club had an annual work day that included "cutting out" the roads, "cutting out" ice damage on the trees, and building deer stands, along with other maintenance.

SLIP OPINION

Boyd Qualls testified that he had lived in the Cave Creek community for twenty-six years and currently lived just west of the Reynoldses. Qualls said that he did not have an understanding of the property lines between the parties; however, he said he was familiar with the road on the Reynoldses' property. He said that the road had been there fifty or more years and that long ago it was regularly used when nearby property was being mined. He added that only the Reynoldses and their friends use the road now.

Cecil James Reynolds (James) testified that he leased his property in 1988 and purchased it in 2003. While he agreed that his deed conveyed to him only an eighty-acre tract, it was his belief that his tract included the property in dispute. He said that over the years he used the property south of the fence[3] and that no one has ever questioned his use of the property. He added that the road through his property runs very close to his home, and that since 2003, only his family and his friends have used it. James's wife Donna Reynolds concurred, stating that only their friends and family use their road.

At the conclusion of the trial, the court asked counsel whether there was any dispute that, based on the Reynoldses' deed and the 2009 survey, GFM was the record title holder of the property at issue. Counsel for the Reynoldses conceded that there was no dispute on that matter, to which the trial court stated, "the burden then, of course, . . . falls upon the [Reynoldses] to present their claim [for boundary by acquiescence]."[4] Thereafter, the trial court quieted title in

---

[3]James testified that he ran cattle, built new fences, repaired the old fence, installed deer stands, and cleared the property in dispute.

[4]Also during this colloquy, counsel for the Reynoldses conceded that while they asserted adverse possession as an affirmative defense in their answer, they could not prove adverse possession, and, as such, abandoned that defense, relying solely on boundary by acquiescence.

SLIP OPINION

the disputed property in accordance with the 2009 survey; found that the Reynoldses failed in meeting their burden of proving that the fence on GFM's property was a boundary line by acquiescence; and found that the road across the Reynoldses' tract was subject to a prescriptive easement in favor of GFM, its successors, assigns, and invitees, but not the public. After the decree detailing these findings was entered by the trial court, the Reynoldses timely filed a notice of appeal.

The Reynoldses' first point on appeal is that the trial court clearly erred in finding that the fence did not constitute a boundary by acquiescence. A fence, by acquiescence, may become the accepted boundary even though it is contrary to the survey line. *Strother v. Mitchell*, 2011 Ark. App. 224, at 17, 382 S.W.3d 741, 752. When adjoining landowners occupy their respective premises up to the line they mutually recognize and acquiesce in as the boundary for a long period of time, they and their grantees are precluded from claiming that the boundary thus recognized and acquiesced in is not the true one, although it may not be. *Id.*, 382 S.W.3d at 752. A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. *Id.*, 382 S.W.3d at 752. It is the agreement and acquiescence, not the fence itself, that controls. *Id.* at 17–18, 382 S.W.3d at 752. The intention of the parties and the significance they attach to the fence, rather than its location or condition, is what is to be considered. *Id.* at 18, 382 S.W.3d at 752. Neither a prior dispute about the boundary line nor adverse usage up to a fence is required to establish a boundary by acquiescence. *Id.*, 382 S.W.3d at 752.

SLIP OPINION

We have noted that the mere existence of a fence, without evidence of mutual recognition, cannot sustain a finding of such a boundary. *Id.*, 382 S.W.3d at 752. Also, the fact that a landowner puts a fence inside his boundary line does not mean that he is acquiescing in the fence as the boundary, thereby losing title to the strip on the other side. *Id.*, 382 S.W.3d at 752. That occurs only if the neighbor takes possession and holds it for the requisite number of years. *Id.*, 382 S.W.3d at 752–53.

Finally, because the location of a boundary is a disputed question of fact, we will affirm unless the trial court's finding is clearly against the preponderance of the evidence. *Id.*, 382 S.W.3d at 753. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite conviction that a mistake was committed. *Id.* at 18–19, 382 S.W.3d at 753. Whether a boundary line by acquiescence exists is to be determined from the evidence in each individual case. *Id.* at 19, 382 S.W.3d at 753.

In the case at bar, the trial court found that the Reynoldses failed to prove their claim for boundary by acquiescence. The court specifically stated at the conclusion of the trial that to meet their burden of proof, the Reynoldses would have to prove that the conduct, beliefs, and intentions of *both* landowners established a tacit agreement that the fence line was the boundary line. However, in this case, as found by the trial court, there was an absence of this type of evidence from the perspective of GFM or its predecessors. No witness offered evidence that GFM or its predecessors believed or intended the fence to be the boundary line. And while each of the Reynoldses' witnesses testified that they were familiar with the fence line, had been on the property in dispute, and may have thought that the fence line was the boundary line, none were

–6–

SLIP OPINION

certain where the boundary line between the parties' property was and none testified about GFM's or its predecessors' tacit agreement or recognition that the fence line was the boundary line.

Notably, James Reynolds's testimony provided only half of the requirements needed to establish boundary by acquiescence. He stated that he and his family had always considered the fence line as the boundary line, that they used the disputed property for forty years, and that they maintained the disputed property. However, the mere subjective belief that a fence is the boundary line is insufficient to establish a boundary between two properties. *Boyster v. Shoemake*, 101 Ark. App. 148, 152, 272 S.W.3d 139, 143 (2008). James did not offer any evidence of GFM's mutual recognition of the fence as the boundary. The trial court stated, "[James Reynolds] was very frank in his testimony, he said . . . 'I always thought that [my property] went up to the fence line . . . .' But he never really came out and said anything about some sort of an agreement either implicitly or explicitly with any other landowner that would give you acquiescence."

Moreover, as pointed out by the trial court, there was evidence of GFM's conduct that established that it did not believe the fence was the boundary line. Several witnesses testified that south of the fence line, there were deer stands that were maintained by GFM. Also, there was evidence that the hunting club, owned by GFM, managed and maintained (at least annually) the property south of the fence.

SLIP OPINION

Because there was an absence of testimony showing that GFM considered the fence to be the property line and there was evidence of GFM's conduct to the contrary, we hold that the trial court did not clearly err in refusing to find the fence was the boundary by acquiescence.

The Reynoldses' next argument is that the trial court clearly erred in finding that GFM was entitled to a prescriptive easement in the Reynoldses' road. The following summarizes our law on prescriptive easements:

> A prescriptive easement may be gained by one not in fee possession of the land by operation of law in a manner similar to adverse possession. In Arkansas, it is generally required that one asserting an easement by prescription show by a preponderance of the evidence that one's use has been adverse to the true owner and under a claim of right for the statutory period. This court has said that the statutory period of seven years for adverse possession applies to prescriptive easements.

> Overt activity on the part of the user is necessary to make it clear to the owner of the property that an adverse use and claim are being exerted. Mere permissive use of an easement cannot ripen into an adverse claim without clear action, which places the owner on notice. Some circumstance or act in addition to, or in connection with, the use which indicates that the use was not merely permissive is required to establish a right by prescription. The determination of whether a use is adverse or permissive is a factual question, and former decisions are rarely controlling on this factual issue. The plaintiff bears the burden of showing by a preponderance of the evidence that there has been adverse, not permissive, use of the land in question

*Willows, LLC v. Bogy*, 2013 Ark. App. 59, at 3 (citing *Roberts v. Jackson*, 2011 Ark. App. 335, 384 S.W.3d 28).

We review cases that traditionally sound in equity de novo on the record, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Acuna v. Watkins*, 2012 Ark. App. 564, at 6, ___ S.W.3d ___, ___. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*, ___ S.W.3d at ___. In reviewing a trial

SLIP OPINION

court's findings, we give due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* at 6–7, ___ S.W.3d at ___. Disputed facts and determinations of witness credibility are within the province of the fact-finder. *Id.* at 7, ___ S.W.3d at ___. It is our duty to reverse if our own review of the record is in marked disagreement with the trial court's findings. *Id.*, ___ S.W.3d at ___.

In the case at bar, the trial court found that the Reynoldses' road had

> been used by the community for a long, long time, way before—well, it's been used by the Reynolds, in fact, and [their predecessors]. It's been used so long that there is a prescriptive easement across it. The fact that they bought it, that's a switch in landowners, it's been used as a road long—probably even before [the Reynoldses' predecessors] owned it. So as far as I'm concerned, there is a right-of-way across the road.

The Reynoldses argue that the trial court's finding on this issue was clear error because there was no evidence in the record that GFM, or its predecessors, used the road adversely for seven years. We agree. No witness testified that GFM used the road in any fashion, much less adversely and overtly, for seven years. And while every witness at trial testified that they had used the Reynoldses' road, none testified that they used it in a manner that was adverse or hostile to the ownership rights of the Reynoldses. To the contrary, there was ample evidence of permissive use of the Reynoldses' road. According to Qualls, Downs, and James and Donna Reynolds, since 2003, only the Reynoldses and those with their permission had used the road. This was corroborated by evidence that when Smith and Lemley recently traveled on the Reynoldses' road, their use of the road was interrupted by Donna and James Reynolds.

While the Reynoldses' road may have been used often in the past, there is no evidence that that use was anything other than permissive. In recent years, the evidence presented was that

only the Reynoldses and their friends used the road. There is a lack of evidence that for seven years GFM adversely used the road. Therefore, we hold that the trial court clearly erred in awarding GFM a prescriptive easement in the Reynoldses' road, and we reverse on that issue.

Affirmed in part; reversed in part.

WHITEAKER and HIXSON, JJ., agree.

*Bristow & Richardson, PLLC*, by: *Melissa B. Richardson*, for appellants.

*Blair & Stroud*, by: *Robert D. Stroud*, for appellee.