SLIP OPINION



Cite as 2016 Ark. App. 104

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–15–654

| | |
|---|---|
| LAROY FOSTER | **Opinion Delivered** FEBRUARY 17, 2016 |
| APPELLANT | |
| V. | APPEAL FROM THE FULTON COUNTY CIRCUIT COURT [NO. CV-13-29] |
| GERALD L. WASSON AND LISA WASSON, TRUSTEES OF THE WASSON FAMILY TRUST UTA DATED MARCH 28, 2007 | HONORABLE TIM WEAVER, JUDGE |
| APPELLEES | AFFIRMED |

## DAVID M. GLOVER, Judge

This is an appeal from the circuit court's decision that appellant Laroy Foster failed to prove ownership of approximately 13.8 acres either by a boundary by acquiescence or by adverse possession, instead quieting title to the acreage in appellees Gerald and Lisa Wasson, trustees of the Wasson Family Trust UTA dated March 28, 2007 (Wassons). On appeal, Foster argues the circuit court erred in requiring direct evidence of "mutual recognition" to prove a boundary by acquiescence; alternatively, he also argues the circuit court erred in finding he did not own the acreage through adverse possession. We affirm the circuit court's decision.

*Facts*

In October 2009, the Wassons purchased property located in Fulton County, Arkansas, from Loyd Guffey, trustee of the Loyd Guffey Revocable Trust. The Wasson property is located directly south of property owned by Foster. In March 2013, the Wassons filed a

petition in the Fulton County Circuit Court, alleging Foster had constructed a fence that encroached on their property and requesting that the circuit court enter an order directing Foster to remove the fence. In his answer, Foster asserted the fence was in existence prior to the time he purchased his property in 1972, and he had maintained the fence since that time and had a right to maintain the fence; he requested that the circuit court declare the fence to be the boundary line. Foster also filed a counterclaim asserting that the property line had been established by a fence that has been in place since prior to 1973; that the fence was a "very old fence" when he purchased his property in 1973; and that he had maintained the fence during the duration of previous owners of the Wasson property and there had never been an issue or dispute as to the property line (the "disputed tract").[1]

In May 2014, the Wassons amended their petition to add Loyd Guffey, as trustee of the Loyd Guffey Revocable Trust, or his successor trustee, requesting that, should the circuit court find Foster had the right to maintain the fence, that they be awarded damages in an amount to be proved at trial for breach of the warranty deed provided to them by Guffey. After a hearing, the circuit court entered an order on May 4, 2015, denying Foster's claims of boundary by acquiescence and adverse possession to the fence and quieting title in the Wassons to all the real property to which they claimed record title. The order also reserved all pending issues against Loyd Guffey. Foster filed a timely notice of appeal. However, after a joint motion from Foster and the Wassons, the circuit court entered an amended order on July 10, 2015, making the same findings but including a Rule 54(b) certificate to address the

---

[1]13.8 acres north of the fence is the subject matter of this litigation.

claim that remained outstanding between the Wassons and Loyd Guffey. Foster then filed a timely amended notice of appeal on July 22, 2015.

At the hearing, the parties entered as joint exhibits the survey ordered by the Wassons, dated January 2, 2013; the same survey with the disputed fence located on it; the trustee's deed by which the Wassons took title to their property; and the deed by which Foster took title to his property. The parties stipulated that the survey accurately depicted the property contained in the Wassons' deed and that Foster claimed the fence should be considered the property line, either as a boundary by acquiescence or by adverse possession.

Foster testified he grew up in the 1940s on the farm next to the disputed tract, and he knew about the fence at that time. He said the fence was there when he purchased the property in 1972, and he considered the fence to be the boundary line. Foster testified that he ran cattle on the disputed tract; that the fence served as the turning point for his cattle; that he had always maintained the fence; and that he had always claimed the fence as the property line. Foster testified he and Loyd Guffey (who owned the Wassons' property from 1995 until he sold it to the Wassons in 2009) had never had a dispute about the fence; he admitted Guffey had told him the fence came across his (Guffey's) property, but he said nothing was ever done to move the fence when Guffey owned the property. He had no knowledge whether a Mr. Donovan, the owner of the property prior to Guffey, had any dispute about the location of the property line. Foster said no one had ever made any claim to the property north of the fence, i.e., the disputed tract, until the Wassons brought their lawsuit. Foster pointed out the property south of the fence had been logged, but the property on the north

side of the fence had never been logged. Foster testified he paid property taxes on his 160 acres every year; he thought his property went down to the fence; and he was not claiming that he had paid taxes on any part of the Wassons' property.

On cross-examination, Foster admitted the fence was in a wooded area; it could not be seen from the road because it was over a hill; and part of the fence was nailed to trees in the wooded area. When asked by the Wassons' attorney why the Wassons would think a fence two to three hundred feet off the property line would lead them to believe Foster was claiming that as a boundary line, Foster said it was the only fence out there, and there was some cow manure in the woods. Foster also said he had driven a "ride-on" through the woods but admitted it had been three to four years ago.

Robert Wray testified he had lived on the Foster farm until he was eighteen; he was now almost sixty-eight; and he had no knowledge of what had occurred on the disputed tract over the last fifty years. Wray said the fence had always been there, but he did not know if it was the property line or not. Wray stated his parents maintained the disputed tract up to the fence, but he doubted his parents had ever had their property surveyed.

Bruce Flemon, Foster's son-in-law, testified he had helped Foster repair the fence on two occasions over the last thirteen years, and he had used a "side-by-side" to take tools and materials down to repair the fence. Flemon said the fence was used to turn the cows. Flemon testified he did not know of anyone disputing the fence as the property line prior to this lawsuit, but he agreed that, according to the survey, the fence sat off the Wassons' deed line by two hundred to three hundred feet.

SLIP OPINION

Brian Keen, the surveyor who performed the survey on the Wasson property, testified that the original survey did not show the fence but that the joint exhibit was created for the purpose of showing the fence. Keen stated that the fence goes across the northern part of the Wasson property and was not noticed at first because it was so far from the property line; however, he said that on the day he set the corners for the survey, he was told by Flemon that there was a fence in the woods. Keen stated he talked to the Wassons to find out if the fence was one of convenience and what they wanted to do about it; the Wassons requested he go back and locate the fence. Keen said the fence went tree to tree, with some fence posts; it just "meandered" through the woods; there was nothing about the fence to make one think it was a boundary fence; it was just a fence of convenience through the woods because it was so far from the property line; the fence ranged from 220 to 485 feet off the actual property line; in order to see the fence, one would have to walk through the woods; he did not notice the fence when he was performing the initial survey because it was "way on back" in the woods from the deed line; and the disputed tract was 13.8 acres.

Lisa Wasson testified she and Gerald purchased their property in 2009 and placed it in a family trust. She said she walked the property prior to buying it and noticed a dilapidated fence that "swooped" down, but she said she could walk over the fence; the metal pieces of the fence were so brittle they could easily be broken; and she never would have thought anyone would consider it to be a boundary fence. Lisa said she never saw anything on either side of the fence that would lead her to believe it was a boundary fence, but after the survey, Foster came in and cut down trees to make a path to the fence and put up new portions of

fencing using old materials and even moved the fence further onto their property where the fence went through the woods. Lisa said she could see signs of cattle beyond the fence on their property, but she also stated the cattle could easily walk over the fence, which she did not consider to be a boundary fence. She said prior to the survey, she never noticed any action by Foster that would give her an indication he was claiming the fence to be a boundary fence. Lisa said they talked to Foster after they purchased the property but never really came to an agreement, so they had a survey performed. She said they did not talk to Foster prior to purchasing the property because she did not ever consider the fence to be a boundary because it was in such bad shape.

Gerald Wasson testified he had heard Lisa's testimony, understood it, and concurred with it. He said he did not walk the property; that Lisa had casually mentioned the existence of an old fence on the property. Gerald testified when he noticed the fence had been repaired, he called Foster to ask what was happening with the fence that was on his (Gerald's) property, and Foster adamantly told him that there was a fence there, and it was going to stay there. Gerald told Foster the fence was on his property, and the two of them agreed there was going to be a problem. Gerald stated he never considered the fence to be a boundary fence; while he admitted there was a remnant of a fence, it was nothing that he would consider to be a boundary fence.

On rebuttal, Bruce Flemon denied the fence was ever repaired with old materials. He said when sections of the fence were replaced, they used new materials.

At the close of the hearing, the parties agreed that the trial court would go with the

attorneys and view the property. After viewing the property, the circuit court then quieted

title in the Wassons, and this appeal followed.

*Standard of Review*

Equity cases are reviewed de novo on the record, and the appellate courts do not

reverse the trial court's findings of fact unless they were clearly erroneous. *Boyd v. Roberts*, 98

Ark. App. 385, 255 S.W.3d 895 (2007). A finding is clearly erroneous when, although there

is evidence to support it, the reviewing court is left with the definite and firm conviction that

a mistake has been committed. *Ward v. Adams*, 66 Ark. App. 208, 989 S.W.2d 550 (1999).

In reviewing a trial court's findings of fact, the appellate courts give due deference to the trial

court's superior position to determine witness credibility and the weight to be accorded their

testimony. *Boyd v. Roberts*, *supra.*

*Boundary by Acquiescence*

Foster first argues the circuit court erred in finding he had failed to prove that the fence

was a boundary by acquiescence. In *Teague v. Canfield*, 2014 Ark. App. 712, at 5 (citations

omitted), this court held:

> A boundary by acquiescence may arise when adjoining landowners tacitly accept a
> fence, or other monument, as the visible evidence of a property boundary and
> apparently consent to it. A boundary by acquiescence that is inferred from landowners'
> conduct over many years can imply the existence of an agreement about the location
> of the boundary line. This boundary line may exist without prior dispute. Neither the
> mere existence of a fence, nor one party's subjective belief that a fence is a boundary
> line will sustain a finding of acquiescence. An express recognition or agreement
> between the parties is not necessary. Tacit acceptance may suffice if a mutual
> recognition of the boundary line can be inferred from the parties' conduct over a
> period of years.

Because the location of a boundary is a disputed question of fact, the appellate court will

7

affirm unless the trial court's finding is clearly against the preponderance of the evidence. *Strother v. Mitchell*, 2011 Ark. App. 224, 382 S.W.3d 741. Whether a boundary line by acquiescence exists is to be determined from the evidence in each individual case. *Id.*

Foster argues that Robert Wray testified, without rebuttal, that the disputed tract was maintained to the fence line more than fifty years ago. However, Wray also testified he did not know where the property line was, and he was not familiar with what had occurred on the property over the past fifty years. Foster's testimony was that the fence was in existence since the 1940s, and he had treated the disputed tract as his own since he purchased his separate property in 1972. He asserts the neighboring landowner, a Mr. Donovan, acquiesced in the fence as the property line; however, there is absolutely no evidence the fence was mutually recognized as the property line. As to when Loyd Guffey owned the property, by Foster's own testimony, Guffey told Foster the fence went across Guffey's property; clearly, there was no tacit agreement by Guffey to recognize the fence as the boundary line.

Additionally, the surveyor, Brian Keen, did not even include the fence on his original survey of the Wassons' property because the fence was so far off the property line. Keen testified that in his opinion, this was merely a fence of convenience, not a possession or boundary fence. The mere existence of a fence is not sufficient to establish a boundary by acquiescence. *Teague, supra.* Lisa Wasson testified the fence was dilapidated and could be walked over; her testimony was that she never considered the fence to be a boundary fence. There is no indication there was ever mutual recognition of the fence as the boundary line—it was only Foster's opinion, which is also insufficient to establish a boundary by acquiescence.

Given the disputed facts, and the circuit court's wide latitude as to credibility, we cannot say that the circuit court's decision was clearly erroneous.

*Adverse Possession*

Foster also argues the circuit court erred in finding he had failed to prove that he adversely possessed the real property in question. Specifically, he argues the circuit court erred in finding his usage of the land was insufficient to place the Wassons on notice of the adverse nature of his claim. He claims that fencing the disputed tract is an act of ownership evidencing adverse possession, and the fact that the fence may be degraded does not necessarily mean the area is no longer "enclosed." The question is whether the enclosure is sufficient to "fly the flag" over the land and give notice to the true owner that the land is being adversely claimed. *Boyd v. Roberts*, *supra*. Foster further asserts that he drove vehicles through the property and grazed cattle on the property.

To prove adverse possession, there are six distinct and necessary elements that an adverse claimant must show before that possession ripens into ownership—the possession must be (1) actual; (2) visible and notorious; (3) distinct and exclusive; (4) of a hostile character; (5) accompanied by an intent to hold adversely against the true owner; and (6) for a period of seven years' continuous duration. *Clark v. Clark*, 4 Ark. App. 153, 632 S.W.2d 432 (1982). The *Clark* court addressed each factor in greater detail:

> The first five elements deal with the required nature and extent of the possession. Proof as to those factors may vary and must be measured by reasonable view as to the location and character of the land itself. It is ordinarily sufficient if the acts of ownership are of such a nature as one would exercise over his own property and would not exercise over that of another. The act must amount to such dominion over the land as it is reasonably adapted to and under circumstances as would put the true

9

owner on actual or constructive notice of an adverse claim. Those acts of control which might constitute efficient dominion and notice as to one tract might not be held sufficient in another case.

*Clark*, 4 Ark. App. at 159, 632 S.W.2d at 436 (citations omitted).

In *Lafferty v. Everett*, 2014 Ark. App. 332, at 2–3, 436 S.W.3d 479, 480–81 (citations omitted), our court held:

> It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his own property and would not exercise over the land of another. A party seeking to acquire title to woodland under claim of adverse possession must show "actual use of the land of such unequivocal character as to reasonably indicate to the owner visiting the premises during the statutory period that such use and occupation indicate an appropriation of ownership in another." Whether possession is adverse to the true owner is a question of fact.

Here, the Wassons' property, specifically the disputed tract, was woodland in a field. There was testimony from Lisa Wasson the fence was dilapidated and she would not ever have considered such a fence to be a boundary fence. Likewise, the surveyor testified that in his opinion, the fence was merely one of convenience and not a boundary fence. The grazing of cattle was sporadic. Foster and his son-in-law testified they only used a vehicle to repair the fence a handful of times. Given this testimony, Foster failed to prove his use of the land unequivocally indicated that he was claiming ownership of the disputed property. We cannot say the circuit court's decision—given its responsibility in assessing the evidence and making credibility determinations—was clearly erroneous.

Affirmed.

VIRDEN and KINARD, JJ., agree.

*Jeremy B. Lowrey*, for appellant
*Johnson, Sanders & Morgan*, by: *Roger L. Morgan*, for appellees.