BART F. VIRDEN, Judge
Appellants, William Ray McJunkins ("Ray"), Angie McJunkins, Paula Knight, *898 and Garland F. "Kip" McJunkins, Jr., deceased,[1] appeal from the Grant County Circuit Court's orders denying their claims of boundary by acquiescence and adverse possession with respect to two disputed areas of land, to which appellees Phillip and Virginia McJunkins ("Phillip") hold legal title. The trial court also ordered Ray to pay Phillip $1,072.78 for survey indicators that he had removed from Phillip's land. Appellants argue that the trial court clearly erred in its decision. We affirm in part and reverse and remand in part.
I. Background and Procedural History
J.D. McJunkins had five sons. Shortly before he died, J.D. had his property surveyed by William Fred Spears, Jr., on March 3, 1986. He then brought all his sons together and gave each son a deed to an approximate 18.18-acre tract of land from the family farm. The deeds were dated March 26, 1986, and referred to the Spears survey. J.D. died in April 1986.
The five sons are Ford McJunkins, Sr., who died in 2003 and left Tract 5 to his son, Ford McJunkins, Jr.; Donald McJunkins, deceased, who left Tract 1 to his son, Mike McJunkins; Garland McJunkins, Sr., who died in 2012 and left Tract 4 to his three children (appellants Ray, Paula, and Kip); Houston McJunkins, deceased, who sold Tract 3 to his brother, appellee Phillip, in 1987; and Phillip McJunkins, the youngest and only surviving son, who inherited Tract 2. Near the family farm is what is known as the Reeves tract, consisting of eight acres. Clyde Reeves first owned the tract, and he left it to his son Travis Reeves. Travis sold it to Ford McJunkins, Jr., and his wife in 1992, and they sold it to appellants Ray, Angie (Ray's wife), and Kip in 2015.
This family dispute involves Tract 3, which is a backwards L-shaped piece of land belonging to Phillip; Tract 4, belonging to appellants Ray, Paula, and Kip, which is a rectangular piece of land located adjacent to the north and northwest sides of Tract 3; and the Reeves tract, which is a square piece of land located south of the western portion of Tract 4 and west of the southern portion of Tract 3 and is now owned by appellants Ray, Angie, and Kip. A county road bisects the family farm and runs north and south through Tracts 3 and 4. The pieces of land claimed by appellants are located on Phillip's Tract 3. One area consists of approximately half an acre lying south and east of Tract 4. It includes a small pond in the southeast corner and is enclosed by a hog-wire fence. The other area claimed by appellants is a long, narrow strip of land running north and south and consisting of approximately six-tenths of an acre. It lies adjacent to the east side of the Reeves tract and west of the county road.
In March 2016, Phillip's lawyer sent a letter to Ray stating that, although Ray and his father had permission since 1986 to use part of Phillip's land without paying rent, Ray no longer had permission to use the land enclosed by the hog-wire fence. On May 10, 2016, appellants filed a complaint against Phillip alleging that they had acquired the two disputed areas set forth above through boundary by acquiescence, or alternatively, adverse possession. According to appellants, neither they nor their predecessor had sought or were granted permission by Phillip to use the land. Appellants also asserted a claim for trespass. Phillip answered the complaint, generally denying the allegations, and stated affirmatively that Garland had permission to use the land enclosed by the hog-wire *899 fence. Phillip also asserted a counterclaim for unlawful detainer, quiet title, and trespass. He requested damages for trespass including, among other things, Ray's removal of survey stakes and posts. A hearing was held on October 17, 2016.
II. Trial Testimony[2]
A. Area Enclosed by the Hog-Wire Fence
Ray testified that there was an old meandering barbed-wire fence surrounding an area they called the hog pen. He said that he remembered walking over it as a kid and said that it "wasn't really usable" any longer. Ray said that he thought the old barbed-wire fence, which had been stretched along a tree line, was on the property line separating Tract 3 and Tract 4. Ray stated that in September or October 1986, he and his father Garland, along with a friend named Jeff McDermott, built the hog-wire fence just inside the old barbed-wire fence. Ray said that he was fourteen years old at the time and that he "really didn't know about the [Spears] survey." He stated that he and his father built the hog-wire fence because they wanted to raise and butcher hogs but that they had later used it for goats and cattle. Ray said that his Uncle Houston still owned Tract 3 when the hog-wire fence was built and that Houston did not complain about its location. He said that after Phillip bought Houston's land, Phillip did not complain until recently.
Ray testified that Garland and Phillip owned cattle, which they ran together, and that occasionally one of the sick cows-his or Phillip's-would be put inside the hog-wire fence. He said that a corral had been built on Phillip's land in 2007 and that they had all used the corral in their cattle operation. He stated that Garland and Phillip stopped running cattle together around 2010. Ray testified that Garland lived in the farmhouse near the hog-wire fence until he died in 2012. Ray said that he currently has one cow that he is tending and two donkeys inside the hog-wire fence.
According to Ray, he has kept the land on his side of the hog-wire fence clean, and he has treated it like his own. Ray said that he and Phillip have mowed up to each side of the fence and that he alone has maintained the fence. Ray testified that he thought his and Phillip's conduct showed that they had both acquiesced that the hog-wire fence is the actual line between their properties.
Ray stated that he had seen white flags tied on his hog-wire fence and some plastic PVC poles nearby. He said that he removed these markers but that they later reappeared. He stated that he saw his cousin Mike on the property cutting bushes off the fence. He said that, when Mike had told him that a fence was going to be built on the property line, he told Mike that he was not moving the hog-wire fence. Ray said that he then received a letter from Phillip's attorney and heard from Phillip himself that he was going to build a fence on the property line. Ray said that he told Phillip that he could put up a fence as long as he did not touch the hog-wire fence.
*900 Amy Marie McJunkins was married to Kip for twenty-seven years until he died in April 2016. She said that she had spent "quite a bit of time" at the farm, that the hog-wire fence had "always been there," and that she had not heard anyone complain about the location of the hog-wire fence.
Ford McJunkins, Jr., testified that he thought Ray and Phillip used the old meandering fence as the dividing line between their properties and that the hog-wire fence encompassed less land than that. He stated that Ray and Garland raised hogs and goats in the old hog pen and brush hogged it in the spring. He said that after the hog-wire fence was built, Ray put cattle in the enclosure because it was easier to get them on the trailer to be taken to the sale barn. He said that he had seen Mike brush hogging on Phillip's side of the hog-wire fence. Ford, Jr., said that when Ford, Sr., Phillip, and Garland had cattle, those cattle were mixed together and that the whole family farm, from Tract 1 to Tract 5, was used in the cattle operation. He said that Phillip sold his cattle around 2010.
Jeff McDermott recalled building the hog-wire fence with Ray and Garland around 1987. He said that Garland had maintained the land inside the fence and raised hogs. McDermott testified that both Garland and Ray had brush hogged within the hog-wire enclosure and had stocked the pond with catfish. He said that he was familiar with "where the pond and stuff was" and that "that" was always the property line. McDermott said that he had not seen Phillip around the farm.
Jeff McJunkins, Houston's son, testified that he had always thought of the land inside the hog-wire fence as Garland's and that he thought the old meandering fence in the tree line was on the property line. He said that Ray had pigs and occasionally a cow inside the hog-wire fence and that Ray and Garland had maintained the fence. He said that he had never heard Phillip say that the hog-wire fence was in the wrong place or that it ought to be moved. He remembered that Phillip and Garland owned cattle that ran together, that the area inside the hog-wire fence was used like a feed lot, and that they would put cattle in the enclosure.
Gary Launius, Ray's coworker, said that he had been going to the farm since 2007 and that the hog-wire fence had been there since that time, that Ray kept cows and donkeys in the enclosure, and that Ray took care of the land inside the fence.
Steve Hankins, a land surveyor for thirty-two years, testified that he had been hired by Ray to do a retracement survey of his entire holdings, including the disputed areas. He said that he knew about the 1986 Spears survey and that the survey he retraced was "spot on" with the earlier survey. He said that he found the original markers from the Spears survey, except one near the southeast corner of the pond, which had been replaced by a marker from B & F Engineering. Hankins also said that he saw PVC pipes driven into the ground on the east side of the old meandering fence but that they were not actual survey markers and were "just out there in space" because the points did not line up with the record-title line.
Hankins further testified that the area inside the hog-wire fence had been cared for differently than the area outside the fence. He said that the area east of the hog-wire fence was overgrown until it reached the old meandering fence in the tree line and that the area beyond the tree line was clear. He further testified that there was a gate along the northeast corner of the hog-wire fence that he assumed could have allowed cattle to go back and forth between the tracts of land.
*901 Phillip testified that he was living in Texas in 1986. He stated that J.D. had wanted him to have the farmhouse because he was the youngest but that he had encouraged his father to give it to Garland because Phillip did not live in Arkansas. He said that he also recommended to his father that Garland be given more land than what had been originally surveyed. Phillip said that no conversation had ever taken place between J.D. and the sons about where the real property lines were and that "we just looked at the survey." He also said, "We all knew the fence lines were meandering."
Phillip testified that what was known as "the hog pen" was initially put up while he was in the service, which he joined in 1961. He stated that the fence currently sits twenty to thirty feet closer to the lot line, which he explained meant the property line found in the Spears survey. He stated that when he left home, J.D. had fifteen to twenty cows and that Ford, Sr., bought cattle that he put in with J.D.'s cattle. Phillip testified that Ford, Sr., had taken care of "dad's whole entire place" and "the fence" for thirty years. Phillip stated that he came back to the farm once every year or two before moving back to Arkansas in 2001. He said that Ford, Sr., ran his cattle on his (Phillip's) and Garland's property until 2002 or 2003. Phillip said that he bought some cows in April 2004 and that both he and Garland started buying cows in 2005. He said that he and Garland used the property inside the hog-wire fence; for example, they would put a cow about to have a calf in the pen because "the old farm house" was nearby. He did not recall how many times he had put a cow in the enclosure. He said that he and Garland shared a cattle feeder and that Garland sometimes placed the cattle feeder in the hog pen. Phillip said that he did not go into the enclosure to brush hog it but that he did feed cows in there "once in a while." Phillip said that he sold his cows in 2010 and asked Garland to move his cattle off his land so he could turn it into pasture for a hay field. He said that he never told Garland to move the hog-wire fence.
Phillip said that he had conversations with Garland about three survey stakes that had disappeared from the 1986 survey and his plans to have the land resurveyed. He stated that, when the stakes began disappearing, he did not have it resurveyed right away because it was "not something that ha[d] been urgent that I needed to do for any particular reason." Two receipts from B & F Engineering, Inc., were admitted into evidence showing that Phillip had paid for professional services, including verifying and setting property corners: one receipt reflected payment of $455.28 in August 2006, and the other receipt showed a payment of $617.50 in March 2015. Phillip said that Garland had followed his surveyors around,[3] pointing them to areas where the lot lines "really were" because he had been present in 1986 when J.D. had the property surveyed.
Mike McJunkins testified that he lives about one-half mile from the family farm and that he helped Phillip maintain his property. He said that in early 2016 he was helping Phillip clear a sight line when Ray threatened to shoot him if he touched the hog-wire fence. When Mike explained that he was cutting brush so that Phillip could see from one corner to another, he said that Ray told him, "Well, them lines don't mean nothing anyway and you can go tell Phillip I said it." Mike said that before he fenced off Tract 1 in 2007, "my family ran cattle kind of all over my grandfather's farm." He said that he had not heard either Phillip or Garland say that the hog-wire *902 fence represented the boundary line between their properties.
B. Area Adjacent to the Reeves Tract
Ray testified that Clyde Reeves owned the Reeves tract originally and that Travis owned it after Clyde died. He said that when the county road was built, Clyde refused to give up any of his land, so J.D. gave up some of Tract 3, which left a narrow strip of Tract 3 on the west side of the county road. He did not think J.D. did anything with that strip of land and that Clyde always "had stuff out there" so he assumed it was Clyde's land. Ray said that he currently has approximately twenty-one head of cattle on the Reeves tract. Ray said that he saw Mike brush hogging Phillip's side of the county road the previous week but that he had not touched Ray's side of the county road. Ray said that the fence along the Reeves tract, including the contested strip, had been there "for a long, long time."
Hankins, the land surveyor, said that a continuous barbed-wire fence ran along each side of the county road. He stated that the Reeves tract was improved pasture, including the strip, and that he saw cattle there. He said that the first time he had gone to the family farm, he saw no marked difference between the land on each side of the county road but that, when he recently visited the family farm, he saw that the east side of the county road had been brush hogged. Hankins said that the east side of the county road was more of an improved hay pasture, whereas the west side was pastureland for livestock.
Ford, Jr., testified that he bought the Reeves tract from Travis in 1992. He said that the fence along the county road was up when he bought the tract. Ford, Jr., said that he did not have a survey done when he bought the land and that he assumed he owned the land to the west of the county road because of the location of the fence. He stated that Phillip had never told him the fence was on his Tract 3. Ford, Jr., said that Ford, Sr., ran cattle on the eight acres and that he sold the tract to Ray in 2015.
Jeff McJunkins testified that he remembered when his cousin Ford, Jr., purchased the Reeves tract in the 1990s and that Ford, Sr., had rebuilt the fence that ran along the county road. He stated that he is forty-six years old and that a fence had been up "longer than I can remember." He did not know whether Phillip had given Ford, Sr., permission to build the fence. Jeff said that he had not heard Phillip say that he agreed the fence was the boundary line but that he did not recall Phillip ever objecting to the fence.
Phillip testified that Clyde and Travis Reeves had done nothing with the Reeves tract and that he was not sure whether they had ever brush hogged it. He said that he did not live in Arkansas during that time and never had a discussion with them about the fence. He said that he had not learned until recently that Ford, Jr., bought the Reeves tract and that he had not spoken with either Ford, Jr., or Ray about the fence line. Phillip further testified that he had placed a game camera near the Reeves tract, and still photographs were admitted into evidence depicting Ray removing a stake with a white flag on the end in April 2016.
Mike testified that he brush hogged Phillip's land east of the county road two or three weeks before trial. He said that he had also brush hogged west of the county road two or three years before trial and explained that there was a deep ditch on that side of the road.
III. Orders on Appeal and Standard of Review
In November 2016, the trial court entered two separate orders denying appellants'
*903 claims. The trial court found that there was no mutual recognition of the hog-wire fence as a boundary line and no silent acquiescence in the fence as a boundary. The trial court also found that appellants' use of Phillip's land was permissive and noted that the family had run the farm together. The trial court further found that appellants' use of the land enclosed by the hog-wire fence was not so notorious, hostile, or exclusive as to put Phillip on notice of any adverse use. The trial court therefore denied appellants' claims for boundary by acquiescence and adverse possession and quieted title to the land in Phillip.
The trial court entered a second order, which incorporated the findings and conclusions in the first order. In the second order, the trial court referred to both disputed areas-the area enclosed by the hog-wire fence and the area adjacent to the Reeves tract. The trial court found that there was no mutual recognition, silent or express, of the fences as a boundary. The trial court also found that, although appellants had color of title to land adjacent to the disputed areas and had paid taxes on the adjacent lands, appellants had failed to prove that they excluded all other persons from the disputed areas. The trial court noted that appellants' possession of the disputed areas was with permission, given testimony that the family had run the farm together until 2010. The trial court ordered appellants to remove their fences so that Phillip could fence his land without obstruction and ordered Ray to pay $1,072.78 for survey markers that he admittedly removed.
Equity cases are reviewed de novo on the record, and the appellate courts do not reverse the trial court's findings of fact unless they are clearly erroneous. Foster v. Wasson , 2016 Ark. App. 104, 483 S.W.3d 301. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake was made. Id. In reviewing a trial court's findings of fact, the appellate courts give due deference to the trial court's superior position to determine witness credibility and the weight to be accorded their testimony. Id.
IV. Applicable Law
A. Boundary by Acquiescence
A fence, by acquiescence, may become the accepted boundary even though it is contrary to the survey line. Barnett v. Gomance , 2010 Ark. App. 109, 377 S.W.3d 317. When adjoining landowners occupy their respective premises up to a line, which they mutually recognize and acquiesce in as the boundary for a long period of time, they and their grantees are precluded from claiming that the boundary thus recognized and acquiesced in is not the true one, although it may not be. Id. A boundary line by acquiescence is inferred from the landowners' conduct over many years so as to imply the existence of an agreement about the location of the boundary line. Id. It is the agreement and acquiescence, not the fence itself, that controls. Id. The intention of the parties and the significance they attach to the fence, rather than its location or condition, is what is to be considered. Robertson v. Lees , 87 Ark. App. 172, 189 S.W.3d 463 (2004). Neither a prior dispute about the boundary line, nor adverse usage up to a fence, is required to establish a boundary by acquiescence. Barnett, supra. Whether a boundary line exists is to be determined based on the evidence in each individual case. Hedger Bros. Cement & Materials, Inc. v. Stump , 69 Ark. App. 219, 10 S.W.3d 926 (2000). The mere subjective belief that a fence is the boundary line is insufficient to establish a boundary between two properties.
*904 Webb v. Curtis , 235 Ark. 599, 361 S.W.2d 87 (1962).
B. Adverse Possession
Adverse possession is governed by both common and statutory law. Horton v. Taylor , 2012 Ark. App. 469, 422 S.W.3d 202. To prove the common-law elements of adverse possession, a claimant must show that he or she has been in possession of the property continuously for more than seven years and that the claimant's possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. Id. It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his or her own property and would not exercise over the land of another. Id. Whether possession is adverse to the true owner is a question of fact. Id. In 1995, the General Assembly added, as a requirement for proof of adverse possession, that the claimant prove color of title and payment of taxes on the subject property or contiguous property for seven years. Ark. Code Ann. § 18-11-106(Repl. 2015).[4] If, however, the claimant's right to the disputed property vested before 1995, he or she need not comply with the 1995 statutory change. Sutton v. Gardner , 2011 Ark. App. 737, 387 S.W.3d 185.
When possession, in its incipiency, is shown to be permissive, there is a presumption of law that the subsequent possession of the same property is also permissive. Dial v. Armstrong , 195 Ark. 621, 113 S.W.2d 503 (1938). The rule is that, where the entry is permissive, the statute will not begin to run against the legal owner until an adverse holding is declared, and notice of such change is brought to the knowledge of the owner. Id. When adverse possession is asserted by one member of a family against another, stronger evidence is required to support the claim than in cases where the family relationship does not exist. Williams v. Killins , 256 Ark. 491, 508 S.W.2d 753 (1974).
V. Discussion
A. Area Enclosed by the Hog-Wire Fence
Appellants argue that they acquired the land enclosed by the hog-wire fence through boundary by acquiescence. They argue that Phillip did not object to the location of the hog-wire fence for thirty years. Appellants state that Ray and Garland openly built the fence in 1986 to raise hogs and goats, they brush hogged inside the fence, and they alone maintained the fence. They contend that Phillip remained silent and did nothing. In support of their position, appellants rely on Boyette v. Vogelpohl , 92 Ark. App. 436, 214 S.W.3d 874 (2005), and Summers v. Dietsch , 41 Ark. App. 52, 849 S.W.2d 3 (1993).
In Boyette , a fence had been constructed at a time when both tracts of land in dispute were owned by the Boyette family. In 1994, the Boyettes acquired their deed to the eastern tract, and the Vogelpohls acquired their deed to the western tract from F.C. Grass Farms Partnership. A barbed-wire fence ran north and south between *905 their tracts. In 2000, the land was surveyed, and the survey showed that the true boundary line sat east of the barbed-wire fence. In 2002, the Vogelpohls began construction of a new fence on the true boundary line. The Boyettes filed suit alleging that the old fence represented a boundary by acquiescence, or alternatively, the disputed land had been acquired by adverse possession. The trial court quieted title to the land in the Vogelpohls. This court reversed that decision and held that the Boyettes had acquired the disputed land by both boundary by acquiescence and adverse possession.
This court noted that the fence had been in place for more than forty years. Both parties had used their property up to the fence. The trial court noted that the Vogelpohls had repaired the fence and painted it, but this court held that the Vogelpohls' conduct showed that they had acquiesced to the fence as a boundary in mowing and caring for the land up to the fence. This court also held that the Boyettes had acquired the land through adverse possession because they had openly and continuously used and occupied the east side of the fence since the 1960s.
In Summers , Roy Summers, appellant Summers's father, bought a forty-acre tract of land in 1943. In 1954, he deeded thirty acres to his father/appellant's grandfather, J.R. Summers. In 1970, Roy deeded the remaining ten acres to appellant Summers, and J.R. sold the thirty-acre tract to Dale Kesner, who then sold fifteen acres to the Dietsches in 1980. A fence running north and south divided the Dietsches' property from Summers's ten-acre tract. In 1991, the Dietsches had the land surveyed and discovered that the fence encroached on both parties' land. The Dietsches filed suit, and Summers responded, stating that the old fence represented a boundary by acquiescence or, alternatively, that the land had been acquired through adverse possession. The trial court quieted title in the Dietsches.
This court reversed and held that Summers had acquired the land through boundary by acquiescence. During the twenty-one years that Summers owned his land, neither the Dietsches nor their predecessors ever objected to the location of the fence, and both parties had used their land up to the fence and maintained the fence. The Dietsches stated that they thought the fence was on their property but admitted that they had done nothing about it until filing the lawsuit. This court did not address the adverse-possession claim.
The tracts at issue here were once part of a large family farm. Unlike Boyette and Summers , the present case involves family members on each side of the fence. The testimony showed that Garland built the hog-wire fence shortly after the brothers had been given their deeds with reference to the Spears survey and that Houston and Phillip were aware that the hog-wire fence was being built. There was testimony that the original hog pen was surrounded by an old fence, which was in disrepair, and that the new hog-wire fence was built to replace it so Garland could raise hogs and keep them separated from the cattle on the farm. The trial court concluded that the fence had not been built for the purpose of designating the property line between the brothers' tracts of land. The trial court found that there was no mutual recognition of, or acquiescence in, the hog-wire fence as the boundary line. We cannot say that the trial court clearly erred in finding that appellants failed to prove that they acquired the disputed land through boundary by acquiescence.
Appellants alternatively argue that Garland began adversely possessing *906 the enclosed area in 1986 or 1987 when he and Ray built the hog-wire fence. Appellants state that the fence was built openly and that Phillip knew about the fence. They argue that, even if they had not adversely possessed it by 1994, they have since then because they and their predecessor have paid taxes on adjacent land and continued to use it as their own ever since.
The trial court found that appellants and their predecessor had used the disputed area with Phillip's permission. There is a presumption that their continued use of his land was with permission until notice of an adverse use was brought to Phillip's attention. Dial, supra. Phillip testified that he did not return to live in Arkansas until 2001. We cannot say that the trial court clearly erred in concluding that appellants' use of the area enclosed by the hog-wire fence was permissive. Moreover, although appellants may have satisfied the 1995 statutory requirements regarding taxes, we agree with the trial court's finding that appellants' possession of the land was neither hostile nor exclusive. It could be inferred from the testimony that Garland and Phillip had an amicable relationship given that Phillip intervened with J.D. to secure more land and the farmhouse for Garland. Also, after Phillip returned to Arkansas, he and Garland ran a joint cattle operation until 2010. Between 2005 and 2010, they both used the area enclosed by the hog-wire fence. Garland passed away in 2012, and appellants Ray, Paula, and Kip inherited the land. They filed their lawsuit in 2016, which is less than seven years of possible adverse possession. We cannot say that the trial court clearly erred in finding that appellants failed to prove that they acquired the area enclosed by the hog-wire fence through adverse possession, especially considering that stronger evidence is required when family members are involved.
B. Area Adjacent to the Reeves Tract
Appellants again rely on Boyette and Summers for their claim to the strip of land west of the county road and assert that the facts here are stronger. They argue that Phillip did not object to the fence for almost thirty years; Phillip did not run livestock on the land; Phillip never maintained the fence; and Phillip did not brush hog the narrow strip of land. According to appellants, the land was fenced and indistinguishable from the rest of the Reeves tract.
We agree with appellants that the trial court clearly erred in finding that the narrow strip adjacent to the Reeves tract was not acquired through boundary by acquiescence. Unlike the area enclosed by the hog-wire fence, there was no testimony that the Reeves tract, including the narrow strip of land, was used in Phillip and Garland's joint cattle operation. Indeed, it was not part of the family farm. The testimony showed that the strip of land had been separated from the rest of Tract 3 by a county road since Clyde owned it and had been enclosed by a fence for many years. Testimony showed that, when Ford, Jr., bought the Reeves tract in 1992 from Travis, a fence was already there and that Ford, Jr., assumed that the fence along the county road represented the property line. The fence was repaired or rebuilt by Ford, Sr., and Ford, Jr., permitted his father to run cattle on the land, including the narrow strip, but there was no testimony that he allowed other family members to do so. The testimony showed that Phillip asked Mike to brush hog Tract 3 but did not instruct him to brush hog the strip of land under fence on the west side of the county road. Hankins said that the Reeves tract, along with the disputed strip of land, was improved pasture with cows on it. The strip of land was indistinguishable from *907 the rest of the eight acres, except for some trees to the north. Because we hold that appellants acquired this land through boundary by acquiescence, we need not address their adverse-possession claim.
C. Payment of Survey Costs
Appellants argue that Ray should not have been ordered to pay the survey costs because appellants owned the disputed areas in question. They contend that, alternatively, the trial court was confused because Ray did not remove "survey markers," but rather removed little plastic stakes that Phillip had placed on the property. Because we hold that appellants acquired the strip of land adjacent to the Reeves tract through boundary by acquiescence, we remand for the trial court to determine how much, if any, of the survey costs Ray should be ordered to pay.
Affirmed in part; reversed and remanded in part.
Abramson and Whiteaker, JJ., agree.

Although he was listed as a party below and is listed as an appellant in this appeal, the record shows that Kip died in April 2016 before trial.

We take this opportunity to remind litigants and their lawyers that we, as an appellate court, have only the record before us to review. Not having been present at the trial below to follow along with witnesses who were obviously pointing at exhibits, this court cannot know what the witnesses were referring to when using words such as "here," "there," "this," and "that." We also point out that when, as here, there was such a large family that a "McJunkins family tree" was introduced as an exhibit, some further specificity in the testimony would have been helpful, instead of saying "we" and "they."

Phillip said that this occurred in 1986, but it appears that he meant 2006.

Tax receipts were introduced into evidence showing that either Ray or Garland paid taxes on Tract 4 from 2006 through 2014 and that Phillip paid taxes on two eighteen-acre tracts of land from 2008 through 2015. Ray testified that he had paid taxes on the Reeves tract after purchasing it from Ford, Jr., in 2015 and asserted that his predecessors in title had paid taxes on it; however, no tax records on the Reeves tract were introduced into evidence. The trial court later asked, "Did everybody pay their taxes on the property as the tax records show?" Counsel for both parties answered affirmatively.