BRANDON J. HARRISON, Judge
Hostility. It's a term of art under Arkansas's adverse-possession law and is front and center in this appeal, which primarily asks: Can Garland Gilmore and Lesha Prater prevail on their adverse-possession claim against Sean and Kim Collier if Garland Gilmore believed he owned the disputed tract of land for some forty years, has possessed and farmed the disputed area for the same length of time, but was initially mistaken on where the relevant deed placed the true boundary line? This mistaken-boundary-line case "brings us to the most difficult, thoroughly maddening, question in all adverse possession, whether an adverse possessor's subjective state of mind, imprecisely often called 'intent,' can destroy hostility." William B. Stoebuck & Dale A. Whitman, The Law of Property § 11.7, at 857 (3d ed. 2000).
I.
In addition to the common-law element of hostility, the testimony elicited from Garland Gilmore during the bench trial on his adverse-possession claim-and the Colliers' stipulation that an additional five witnesses would have agreed with Garland's testimony regarding where the Lyn and Myrtle Holder/Gilmore boundary line was located-decide this case. The Holder/Gilmore boundary matters to the Colliers because they are the Holders' successors to that boundary line and can take no greater title than the Holders held.[1]
No one disputes that the parties in this case acquired title to their respective properties from the Holders. It is also agreed that, since 1972, Garland Gilmore has farmed either soybeans or rice on the disputed strip of land although the deed Gilmore received from the Holders did not include the disputed land. The disputed area that Gilmore claimed through adverse possession is an irregularly shaped strip to the east of the Collier homestead and a thin strip to the south of the Collier homestead. According to Gilmore's testimony *897 during the bench trial, Mr. Holder told him that the 1972 purchase included all the land up to a then-existing fence that once enclosed the property where Mr. Holder lived. The Colliers seek to defeat Gilmore's adverse-possession claim and use the disputed area as a goat pasture.
Gilmore said at trial that, in 1980, he had leveled the field up to the fence line to facilitate rice farming. The fence was eventually removed; but according to Gilmore, since 1980, the land he had leveled that abutted the fence has remained significantly lower in elevation than the land inside the prior enclosed area. The prior fence-line/rice-levee intersection is the boundary line that Gilmore claimed in this case. The Colliers maintain that the description in their deed controls and that the boundary line should conform to the deeds, not to the prior neighbors' (Holder and Gilmore) understanding of where the boundary line is.
Here is the most important colloquy from Gilmore's testimony during the bench trial:
DEFENSE COUNSEL : ... And you said that at that time there was a fence line [around the two acres] that the Holders put up and-or there was a fence there, is that correct?
GILMORE : Yes.
DEFENSE COUNSEL : And you had a conversation with Mr. Holder about that: is that right?
GILMORE : When I bought the place, Mr. Holder, he said that now "Gilmore," he said, "what you are buying , this right here that's under fence don't go with what you are buying ," He said, "That goes with the house and the yard." And I said: "Mr. Holder, just farm up to where y'all have always farmed?" And he said, "That's correct." ... So that's what I did.
DEFENSE COUNSEL : So is it fair to say that regardless of where the survey lines were, you had permission from Mr. Holder to do that?
GILMORE : I did.
DEFENSE COUNSEL : Did he ever put it in writing or anything like that?
GILMORE : No.
DEFENSE COUNSEL : Just a conversation between the two of you?
GILMORE : Yes, sir.
DEFENSE COUNSEL : And this whole time, you believed that that was your property that you were farming: is that correct?
GILMORE : That was my understanding.
DEFENSE COUNSEL : Okay. So it wasn't your intention to take that property from anybody?
GILMORE : Didn't know there was any conflict there.
DEFENSE COUNSEL : Okay. So it wasn't a-you didn't have a hostile intent to take that property?
GILMORE : No. No.
There was no objection to Gilmore's reciting what Holder had said. And we reiterate that the parties stipulated during the bench trial, and the circuit accepted as fact, that an additional five witnesses would have agreed with the essentials of Gilmore's testimony.
The Colliers called no witnesses during their case-in-chief, so the case was submitted to the court for decision after Gilmore had presented his side. The circuit court took the case under advisement and, in due course, entered an order quieting title to the disputed property in Garland Gilmore and his sister, Lesha Prater. Here is some of the court's order granting Gilmore and Prater the relief they requested:
Both parties acquired their respective titles from a common predecessor, Holder. At the time of Plaintiffs' purchase, *898 Holder reserved ownership of the property inside then-existing fence. This finding is supported not only by Gilmore's testimony of statements made at the time of the transaction, but also by the subsequent acts of Gilmore, Holder, and Holder's successors in interest for a period of 40 years. During that time, Gilmore actively farmed the disputed ground each year with all the associated activities of planting, cultivating, and harvesting of crops and general maintenance of the land. Additionally, he levelled the land up to the fence line, creating visible evidence of the fence's location that survived the later removal of the old fence.
....
The evidence clearly established that the parties to the original conveyance (Gilmore and Holder) intended the fence to be the boundary line. Their subsequent actions complied with their mutual establishment of the line, even if the land description did not.
....
[The Gilmores] have met their burden of proof and have established their title to the disputed property by adverse possession..... Plaintiffs' motion to amend the pleadings to conform to the proof is granted.
....
However, because the Plaintiffs have met the burden of proof as to their adverse possession claim, the Court makes no dispositive findings on the alternative theories.
II.
The Colliers appealed the October 4 judgment and urge two points: the Gilmores failed to sufficiently establish their adverse-possession claim; and the circuit court erred when it allowed the Gilmores to amend their complaint at trial to add additional claims for relief (boundary by acquiescence and boundary by estoppel).
The adverse-possession claim. Adverse possession is governed by Arkansas common law and statutes. Horton v. Taylor , 2012 Ark. App. 469, 422 S.W.3d 202 ; Ark. Code Ann. §§ 18-11-101 to -106 (Repl. 2015). To prove the common-law elements of adverse possession, a claimant must show that he or she has possessed the disputed property continuously for seven years and that the possession has been "actual, open, notorious, continuous, hostile, and exclusive[;] and it must be accompanied with an intent to hold against the true owner." Thompson v. Fischer , 364 Ark. 380, 384, 220 S.W.3d 622, 625 (2005). Again, only the shape-shifting "intent" element in the common law is at issue.[2]
There is support in some aging caselaw for the position that a possessor's subjective state of mind matters when trying to establish whether a possession was hostile. See, e.g. , Ogle v. Hodge , 217 Ark. 913, 916, 234 S.W.2d 24, 25 (1950) (holding that if the possession is up to a fixed boundary under a mistake as to the true line and the intention is to hold only to the true line, the possession is not hostile and will not ripen into title); Murdock v. Stillman , 72 Ark. 498, 82 S.W. 834 (1904) (same); Barclay v. Tussey , 259 Ark. 238, 241, 532 S.W.2d 193, 195 (1976) ("[T]he doctrine of *899 adverse possession is intended to protect one who honestly enters into possession of land in the belief that the land is his own.") (emphasis added).
There is also support in Arkansas cases (some older, some newer) that a possessor's state of mind does not matter. In other words, the most important evidentiary point regarding the intent element of an adverse-possession claim is the possessor's actual conduct. See, e.g. , Dickson v. Young , 79 Ark. App. 241, 245, 85 S.W.3d 924, 926 (2002) (stating it is the "claimant's objective conduct from which his subjective intent to claim the land that he is possessing is derived that is determinative").
Despite some play in the legal joints, the caselaw has been trending toward the (majority) view that the "hostility" element should be determined by behaviors and not primarily by inquiring into a claimant's subjective intent.[3] We will apply the objective standard in this case.
The Colliers argue that sufficient evidence does not support an adverse possession. The Colliers specifically argue that Gilmore's more than forty-year farming of the property was not a hostile use but a permissive use. Permissive use of property can defeat an adverse-possession claim. Compare Thompson v. Fischer , 364 Ark. 380, 220 S.W.3d 622 (2005) (offer to purchase or permissive use defeats hostile intent necessary for adverse-possession claim), with Baughman v. Foresee , 211 Ark. 149, 152, 199 S.W.2d 596, 597 (1947) (offer to purchase or permissive use does not divest a title that has already vested by adverse possession). Stated more colorfully, " 'Hostility' is the very marrow of adverse possession[.] To say that possession is hostile should mean *900 nothing more than that it is without permission of the one legally empowered to give permission, usually the owner." Stoebuck & Whitman, The Law of Property , supra , at 856. The Colliers argue that the circuit court's finding of adverse possession was clearly erroneous because Gilmore lacked the requisite hostile "intent."
Having applied the majority view that a claimant's conduct can establish the hostility element of adverse possession, our de novo review of the record does not persuade us that the circuit court clearly erred by rejecting a "permissive use" theory of the case and concluding that Gilmore sufficiently established his adverse-possession claim. Lafferty v. Everett , 2014 Ark. App. 332, 436 S.W.3d 479 (standard of review). The circuit court could well have rejected the Colliers' position that Gilmore's cross-examination was an admission that he used the disputed area with Holder's permission and in subordination to Holder's rights. The circuit court could have heard the cross-examination testimony as being, essentially, a recollection of two landowners (Holder and Gilmore) orally confirming, decades ago, what they believed the deed conveyed. Though Holder and Gilmore went out of step with the deed's land description, they did so under a mutual mistake about the actual Holder/Gilmore boundary line that the deed had set. This view squares with Gilmore's testimony that he saw no conflict with Holder and had no "hostile intent to take the property."
Gilmore's act of farming the disputed tract for decades is enough to establish an intent to hold against, and not in subordination to, the true owner's rights. E.g. , Boyd v. Roberts , 98 Ark. App. 385, 391, 255 S.W.3d 895, 899 (2007) (cultivating and planting Bermuda grass sufficient notice of a hostile claim to the property). That Gilmore may have believed that he had farmed up to the "true" property line that the Holder/Gilmore deed established is increasingly unimportant under modern adverse-possession law because Gilmore was, in fact, possessing his neighbor's land. And the possession was "hostile" because it was to an extent greater than the deed anticipated; and his conduct was not subordinate to Holder's property interests or done with Holder's permission. Although the disputed tract was not physically enclosed (by a fence for example), a point the Colliers make, this fact is not pivotal. By all accounts, Gilmore had farmed the property for decades, and the disputed boundary line was a cultivation line that has been clearly identifiable for decades. Compare Hedger Bros. Cement & Materials, Inc. v. Stump , 69 Ark. App. 219, 223, 10 S.W.3d 926, 929 (2000) (invisible line between levees not a clear enough boundary line), with Clark v. Casebier , 92 Ark. App. 472, 479, 215 S.W.3d 684, 688 (2005) (irrigation ditch established the boundary line). Gilmore's adverse possession legally altered the boundary line between the Colliers' property and Gilmore's. Because the circuit court decided the case in accord with the evidence and the law of adverse possession, we affirm its decision that Gilmore proved his claim.
The amended-complaint issue. The Colliers' second point on appeal-the circuit court abused its discretion when it allowed Gilmore to amend his complaint to include additional theories (boundary by acquiescence or estoppel)-is but half complete. The circuit court expressly stated, "[B]ecause the [Colliers] have met the burden of proof as to their adverse possession claim, the Court makes no dispositive findings on the alternative theories." Because the court decided the case solely on an adverse-possession claim, the amendment was not used to make any merit-based decisions against the Colliers. In other *901 words, the Colliers' legal rights were not adversely affected by the ruling. We respectfully decline to give the equivalent of an advisory opinion on the Colliers' second point.
III.
The circuit court's judgment is affirmed.
Affirmed.
Abramson and Brown, JJ., agree.

No party has fully explained the chain of title and who holds what interest. Lesha Prater is Garland Gilmore's sister. In 1972, Lyn Holder and Myrtle Holder conveyed a parcel of land (approximately 38 acres) to four co-owners/two married couples: H.G. Gilmore and Verna H. Gilmore and Garland Gilmore and Lurline Gilmore. In 2012, Adam Lassiter, Jessica Lassiter, and Amy Lassiter-who appear to be heirs or assigns of Lyn and Myrtle Holder-conveyed approximately two acres containing the original homeplace to the Colliers as husband and wife.

In 1995, the General Assembly added the requirement that the claimant prove color of title and payment of taxes on the subject property or contiguous property for seven years. Ark. Code Ann. § 18-11-106. If a claimant's right to the disputed property vested before 1995, however, he or she need not comply with the 1995 statutory change. Sutton v. Gardner , 2011 Ark. App. 737, 387 S.W.3d 185. These and other statutory changes are not at issue.

Is hostility to be determined objectively, without inquiring into the subjective intent of the claimant? Or is her subjective intent an issue? And if the latter, does it matter whether she had mistaken intent or wrongful intent, and if so, may her claim be denied? States differ in their answers to all of these questions.
The majority view and the one favored by secondary authority is that subjective intent is not relevant and that all that matters is the objective intent of the claimant, as evidenced by her actions. The majority approach is the easiest for courts to handle. The claimant simply offers into evidence her acts, proves that they are the same type of acts a true owner would perform, and as long as there was no permission on the part of the owner, adverse possession is proved. It does not matter whether the claimant is an angel or a devil-the acts and the lack of permission are the keys.
Lynn Foster & J. Cliff McKinney II, Adverse Possession and Boundary by Acquiescence in Arkansas: Some Suggestions for Reform , 33 U. Ark. Little Rock L. Rev. 199, 208 (2011) (footnotes omitted).
The modern position of American courts is that possession of land under the mistaken belief of legal ownership usually satisfies the hostility requirements, as long as the possessor does not hold in subordination to another and has no conscious doubt as to his or her rights.... The widely accepted view is that an adverse claim, otherwise valid, is not defeated by an initial mistake as to where the claimant's property ends and the neighbor's property begins. Thus, where a landowner-claimant holds actual possession of a disputed strip of land under a claim of right openly, exclusively, and continuously for the statutory period, mistakenly believing that he or she is holding to the true line, the landowner-claimant acquires the neighbor's title up to that line, and it is immaterial what the landowner-claimant might have claimed in the absence of a mistake. While an act such as fencing is one of the strongest indications of adverse possession, there is generally no per se rule requiring a boundary line to be marked by a physical barrier. Merely because property is not physically enclosed does not render the line incapable of location and description.
Richard R. Powell, 16 Powell on Real Property § 91.05 (Michael Allan Wolf ed., Lexis Nexis Matthew Bender) (footnotes omitted).