Cite as 2022 Ark. App. 506

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CV-21-463

| | |
|---|---|
| SAMUEL WALLACE AND MARY WALLACE | **Opinion Delivered** December 14, 2022 |
| APPELLANTS | APPEAL FROM THE UNION COUNTY CIRCUIT COURT [NO. 70CV-18-440] |
| V. | |
| RAIL RESOURCES, LLC | HONORABLE SPENCER G. SINGLETON, JUDGE |
| APPELLEE | AFFIRMED |

## BART F. VIRDEN, Judge

Samuel and Mary Wallace appeal the Union County Circuit Court's ruling denying their petition for adverse possession.[1] We affirm.

### I. *Relevant Facts*

In October 2006, Mary and Samuel Wallace bought a 3.5-acre parcel of land containing a residential home from Edwin Alderson, Jr., individually and as an executor of

---

[1]The court ruled on several other claims raised by both parties. The court found that the Wallaces had an implied easement regarding the driveway and sewer lines on the disputed property. The court also quieted title in RR's 16.5 acres, denied RR's claim for damages stemming from the delay of the removal of trees from the property, and granted RR an award of damages for conversion. The court also denied RR's request for ejectment and enjoined the Wallaces from entering RR's property. There are no issues on appeal stemming from these other rulings.

the estate of his deceased wife, Janie Alderson.[2] The Wallaces' property is a sectioned-off parcel of the Aldersons' original 20 acres. The remaining 16.5 acres belonged to Edwin. The Wallaces began living in the home immediately after closing. In January 2018, Tracy Alderson sold the remaining 16.5 acres to Rail Resources, LLC (RR), owned by John Hill and Jerry Ramsey.[3]

On September 13, 2018, the Wallaces filed a petition for prescriptive easement. A small section of the Wallaces' driveway was located on RR's land, and since their purchase of the property in 2006, they had used that section of driveway to access their property. Also, the Wallaces' sewer and utility lines ran underneath the driveway. The Wallaces asserted that they had acquired an easement pursuant to twelve years of open, notorious, hostile, and adverse use of the section of driveway and their sewer and utility lines. RR counterclaimed, arguing that the Wallaces were trespassing on the property, and they should be ordered to remove their utility and sewer lines.

---

[2]The Wallaces' property is located at 3701 Calion Road in El Dorado.

[3]It is not entirely clear from the record when the 16.5 acres became the property of Edwin Boyd Alderson Properties, LLC, which is the entity that sold the land to RR in 2018. The warranty deed executed in January 2018 granting the land to RR was signed by Tracy Alderson, who was identified as

> the person authorized by said Limited Liability Company to execute such instrument, stating her capacity in that behalf), to me personally well known (or satisfactorily proven to be such person), who stated that she was the sole Trustee of the Edwin Boyd Alderson Land Trust, Manager of Edwin Boyd Alderson Properties, LLC, an Arkansas Limited Liability Company and was duly authorized in this capacity to execute the foregoing instrument for and in the name and behalf of said Limited Liability Company[.]

On October 19, 2020, the Wallaces filed an amended petition for prescriptive easement, declaratory judgment quieting title, and injunctive relief. The Wallaces contended that title to a 5.475-acre tract of land adjoining the south and west boundary of their property, formerly belonging to the Aldersons and now the property of RR, should be quieted in their name. The Wallaces claimed that they

> moved onto their property with the understanding that the strip of land running along the South and West boundaries of the survey attached to the original petition, and which they maintained, mowed, and improved was their own property included within the legal description of their special warranty deed.

They also requested that the court enjoin RR from driving heavy equipment over their utility lines located under the driveway to prevent them from being damaged and from tearing down any existing structures or building on the disputed land.

At the trial, Mary Wallace described their family's use of the disputed property from 2006 to 2018, as follows.[4] In February 2007, shortly after the Wallaces took possession of their property, they received a letter from Edwin regarding some antique bricks he believed Mary's brother had taken from his property and admonishing them for cutting down a white oak tree. In the letter, Edwin informed the Wallaces that the bricks must be returned and stated that "I am asking you again to please respect our property rights." The Wallaces responded by letter, explaining that they mistakenly believed the white oak had been on their property and denying that Mary's brother took the bricks. The Wallaces asked Edwin to

---

[4]Mary testified that she and her husband paid the taxes on their 3.5 acres adjacent to the disputed property every year since they purchased it in 2006.

consider selling them the disputed property situated "a short distance beyond the barn, a short distance beyond the clean outs with a straight line to the street giving us ownership of the driveway." Mary explained that at the time of the sale, they believed that the entire driveway was included in the property they were buying; however, at closing they learned that it was not and chose to go forward with the purchase anyway. Edwin did not agree to sell them the disputed property and, according to Mary, never gave them permission to use the 5.475 acres. The Wallaces claimed that over the twelve years before RR bought the adjacent 16.5 acres, they maintained the disputed property by clearing brush; planting grass, flowers, and a garden; and using an excavator to create and maintain hiking trails on the property. The Wallaces stated that they had cookouts on the property, built a storage structure to house equipment, and used the barn on the disputed property for storage of equipment and wood. The Wallaces' neighbor, Richard Mason, testified that he assumed the disputed property was a "carve out" that belonged to the Wallaces and that they maintained the disputed property the way it had been maintained by the Aldersons before the sale. Mason stated that he had never discussed ownership of the property with the parties.

Tracy Alderson contradicted Mary's recollection, describing the Wallaces' use of the disputed property as expressly permissive. Tracy explained that in 2005, at her father's behest, she readied the 3.5 acres and the house on it for sale. The Wallaces made the highest bid, and Edwin accepted their offer. Immediately after the sale, during a phone call between her, her father, and the Wallaces, Tracy gave the Wallaces permission to use the adjacent 5.475 acres for recreation, clear the underbrush in the wooded area to their liking, and use

the barn on the property for storage of their tractor. Tracy testified that the trails on the disputed property had been there since she was a little girl and were created for horseback riding. Tracy recalled that the disputed land had always been cleared for their family's use, but Mary had expressed that she wanted more of the underbrush removed, which she (Tracy) consented to. During the next twelve years, Tracy routinely drove her Jeep around the remaining 16.5 acres, including the disputed property, to check on it. Tracy testified that she noticed that the trails were overgrown, and trees had fallen and had not been removed. During one visit, she noticed that the Wallaces had built a gazebo on the land, which did not bother her; however, when the Wallaces painted the barn to match the gazebo, Tracy called them and ordered them to remove the paint immediately. She told Samuel Wallace that "you can't do that to things on my property or I'm going to limit your access." Tracy stated that she did not revoke permission to use the disputed property and barn. In 2018, after the sale of the property to RR, Tracy decided to have the barn demolished because painting had ruined it, it was "time to let that go," and the expense of moving it was prohibitive.

In early 2018, RR purchased the remaining 16.5 acres from Edwin Boyd Alderson Properties, LLC. John Hill, co-owner of RR, testified at the trial, that after he bought the 16.5 acres, he walked around the property and saw overgrown brush with no signs of any caretaking. RR hired Jeff Beavers to cut trees on his property. Beavers testified that he was hired to clear RR's land but ceased work after one day because Mary Wallace saw them on the disputed property and threatened to shoot him and his son. Mary denied threatening to

shoot the Beavers and testified that she told them that she "felt like" shooting their equipment because she was worried the heavy equipment would damage her utility lines. In a text exchange, Mary asked if Hill was cutting trees, and John responded, "Yes I did. They are my trees to cut." Mary acknowledged Hill's ownership, replying "Amen I have no problem with the trees out just making sure it was you thank you." Mary did not respond to Hill's follow-up question regarding her threatening Jeff Beavers and his son. Mary testified that the texts were "a lie," and she did not agree that the trees were Hill's to cut.

Subsequently, Hill hired Andrew Simpson to cut the timber. Simpson flagged the boundary lines, and when he returned to the property a few days later, he saw his flags in a burn pile on the Wallaces' property. Simpson also saw on the burn pile survey stakes that had been on the boundary line when he tied his flags. Mary Wallace confirmed that she had told the gardener to pull up the stakes so that he could mow. The El Dorado Police Department and the Arkansas Department of Agriculture investigated the removal of the survey stakes as a criminal matter.

The circuit court entered a detailed order finding, in relevant part, that the Wallaces had an easement by implication regarding access through the driveway and sewer lines. The court rejected the Wallaces' claim of adverse possession and found that the Aldersons granted them permission to the enter the disputed property, maintain it as it had been maintained before the sale (removing brush and fallen trees), and use the barn for tools and equipment storage. The court determined that Alderson did not revoke permission to use

6

the barn when the Wallaces painted it without her permission. The court quieted the title in RR's 16.5 acres. The Wallaces timely filed their notice of appeal.

II. *Discussion*

The Wallaces' argument on appeal centers on whether their use of the disputed land was permissive. First, they assert that Tracy had no authority to dictate how they could use the land because she did not sell them their property, and she did not own the remaining 16.5 acres. Second, the Wallaces contend that their use of the land was not expressly permitted and was, in fact, hostile. Third, they alternatively argue that if their use was permissive, it ripened into adverse possession. The Wallaces' arguments are not well taken.

We will not reverse findings of fact unless they are clearly erroneous. Further, whether possession is adverse to the true owner is a question of fact. *Strother v. Mitchell*, 2011 Ark. App. 224, at 17, 382 S.W.3d 741, 752. In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

Adverse possession is governed by both common and statutory law. To prove the common-law elements of adverse possession, a claimant must show that he has been in possession of the property continuously for more than seven years and that his possession has been visible, notorious, distinct, exclusive, hostile, and with the intent to hold against the true owner. *Horton v. Taylor*, 2012 Ark. App. 469, at 9, 422 S.W.3d 202, 209. It is ordinarily sufficient proof of adverse possession that the claimant's acts of ownership are of such a nature as one would exercise over his own property and would not exercise over the

7

land of another. *Id.* Whether possession is adverse to the true owner is a question of fact. *Id.* In 1995, the General Assembly added, as a requirement for proof of adverse possession, that the claimant prove color of title and payment of taxes on the subject property or contiguous property for seven years. *See* Ark. Code Ann. § 18-11-106 (Repl. 2015). Permissive use of property can defeat an adverse-possession claim. *Collier v. Gilmore*, 2018 Ark. App. 549, at 7–8, 562 S.W.3d 895, 899.

First, without citing to authority to support their argument, the Wallaces baldly claim that Tracy was without authority to give permission to them to use the disputed property. Appellate courts will not address arguments unless they are sufficiently developed and include citation to authority. *Cleary v. Sledge Props., Inc.*, 2010 Ark. App. 755, 379 S.W.3d 680; thus, we will not address this aspect of the Wallaces' argument.

Second, the Wallaces contend that the circuit court erred when it found that the Aldersons gave them express permission to use the disputed property and contend that their use of the land was hostile. We disagree.

The court heard conflicting testimony regarding whether the Wallaces' use of the land was expressly permissive. At the trial, Mary testified that they had cut trees, bush-hogged, and mowed the disputed 5.475 acres. She recounted planting a garden on the land and hiking on the trails that they kept cleared. Mary stated that they built a gazebo on the disputed property, painted the barn, and housed their equipment in the barn, and they had done all of this without permission for over seven consecutive years. Conversely, Tracy testified that she expressly gave the Wallaces permission to enjoy using the land for recreation

and told them they could use the barn on the property to store their tractor and other equipment. Tracy recounted several incidents when the Wallaces were chastised for their misuse of the property (cutting down the white oak tree, moving bricks, and painting the barn) and were told to "please respect" the Aldersons' property rights; however, Tracy testified that neither she nor her father ever revoked the Wallaces' permission to use the land. Indeed, Tracy told the Wallaces that, though their painting of the barn was not acceptable, she was not revoking their permission at that time.

Essentially, the Wallaces ask us to reweigh the evidence in their favor; however, resolution of conflicting evidence and determination of witness credibility are within the province of the fact-finder. *Horton*, 2012 Ark. App. 469, 422 S.W.3d 202. The circuit court weighed the testimony and evidence and found Tracy's testimony that the Wallaces' use of the land was expressly permissive was more credible. The circuit court did not clearly err in determining that the Wallaces' use of the disputed land was permissive.

Alternatively, the Wallaces argue that their permissive use of the disputed property ripened into adverse possession. In support of their argument, the Wallaces cite *Collier v. Gilmore*, 2018 Ark. App. 549, at 6, 562 S.W.3d 895, 898. In *Collier*, Gilmore believed he owned the disputed tract of land for forty years, and during that time, he possessed and farmed the disputed property; however, Gilmore was mistaken on where the relevant deed placed the true boundary line. Gilmore had bought the land from the Holder family forty years before, then mistakenly farmed soybeans and rice over their south and east property lines. During the trial, Gilmore explained that Holder had told him that his purchase

9

included this strip of land "up to a then-existing fence[.]" *Id.* at 2, 562 S.W.3d at 897. In 1980, Gilmore levelled the land "up to the fence line, creating visible evidence of the fence's location that survived the later removal of old fence." *Id.* at 4, 562 S.W.3d at 898. Eventually, the fence was removed, but the mistaken boundary line was still clearly visible on the surface of the land. The Colliers, the owners of the disputed property, asserted that Gilmore could not have adversely possessed the land because his use of the land was not hostile, as both Gilmore and Holder were mistaken about the true property line. This court favored the adverse possessors' *conduct* over their intent when determining whether their use of the land was hostile and held that "the possession was 'hostile' because it was to an extent greater than the deed anticipated; and his conduct was not subordinate to Holder's property interests or done with Holder's permission." *Id.* at 9, 562 S.W.3d at 900. The facts in *Gilmore* are distinguishable from those in the instant case. Here, there is no mistake as to the boundary line that resulted in decades-long hostile use of the later disputed property. Mary testified that at the closing, she was aware that the disputed land and a section of the driveway were not included in the sale. In the instant case, all parties knew exactly where the boundary line was, and there was testimony that Tracy regularly inspected the disputed property because she believed that it belonged to her family, and the use of the land was discussed between the parties over the years.

The evidence supports the circuit court's decision that the Wallaces' use of the disputed 5.475 acres was permissive, and permission was never revoked. This factual determination depended heavily on the circuit court's opportunity to observe the witnesses

and assess their credibility. We defer to the circuit court's superior position to determine the weight to be accorded the testimony. *See Horton*, *supra*. The circuit court's finding that the Wallaces failed to establish adverse possession was not clearly erroneous, and we affirm.

Affirmed.

BARRETT and HIXSON, JJ., agree.

*McKissic & Associates, PLLC*, by: *Jackie B. Harris*, for appellants.

*Stone & Sawyer, PLLC*, by: *Phillip A. Stone*, for appellee.